*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0270p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

BI XIA QU,

　　　　　　　　*Petitioner-Appellant,*

　　　*v.*

ERIC H. HOLDER, JR.,

　　　　　　　　*Respondent-Appellee.*

No. 09-3118

_____

On Appeal from the Board of Immigration Appeals.
No. A099 024 371.

Decided and Filed: August 27, 2010

Before: COLE and CLAY, Circuit Judges; KATZ, District Judge.[*]

_____

### COUNSEL

**ON BRIEF:** Jim Li, New York, New York, for Petitioner. Emily Anne Radford, Nehal H. Kamani, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

### OPINION

_____

CLAY, Circuit Judge. Petitioner, Bi Xia Qu, appeals a judgment entered by the Board of Immigration Appeals ("BIA" or "Board"), overturning the Immigration Judge's ("IJ") grant of asylum and ordering that Qu be removed from the United States to China. For the reasons set forth below, we hereby **VACATE** the BIA's order and **REMAND** this case to the BIA for proceedings consistent with this opinion.

_____

[*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

1

## BACKGROUND

Qu is a native and citizen of China who was born in 1984. She entered the United States on December 4, 2005 at the Chicago O'Hare International Airport without valid entry documents. On December 15, 2005, the Department of Homeland Security ("DHS") filed a Notice to Appear ("NTA") with the immigration court, initiating removal proceedings against Qu. DHS charged Qu with being subject to removal under 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an immigrant who was not in possession of valid immigration documents at the time of her application for admission. On January 17, 2006, Qu submitted a motion to change venue, admitted the allegations contained in the NTA, and conceded removability.

On July 13, 2006, Qu filed an application for asylum pursuant to 8 U.S.C. § 1158, withholding of removal pursuant to 8 U.S.C. § 1231(b)(3), and protection under the Convention Against Torture ("CAT") pursuant to 8 C.F.R. § 1208.16(c)(2). In her application for asylum and withholding of removal, Qu alleged that she was a victim of human trafficking and involuntary servitude. During a hearing on December 15, 2005 regarding Qu's asylum application, Qu testified that her father, who operated a farm that raised seafood, took out a loan of 300,000 yuan from Zhang. Zhang was a "big thug" in the underground world and had powerful connections in the government. When Qu's father was unable to repay the loan, Zhang visited Qu's home on the morning of October 31, 2005. Zhang demanded that Qu's father repay the loan or allow Qu, who was then 20 years old, to become Zhang's wife. Moreover, Zhang threatened to have Qu's family placed in jail if they reported the incident to the police, claiming to have connections with the police and gangsters.

When Qu returned to her family's home that evening, Zhang kidnapped her and brought her to a guarded home, where she remained for approximately two weeks. On the third day after her kidnapping, Zhang attempted to rape Qu. Zhang slapped and kicked Qu and tore off her clothing, but Qu was able to fight him off. After that incident, Zhang checked on Qu every day and threatened to send her to prison if she did not have sex with him or repay the debt. Zhang also threatened to cut off her hands and

feet if she tried to escape. After approximately a half a month, Qu escaped the house and fled to her aunt's house. Qu's aunt paid a "snakehead" to smuggle Qu into the United States. Qu departed China on November 18, 2005. On the same day, a local civil summons was issued in Qu's name for the debt owed by her father.

During the asylum hearing, the IJ placed the following materials into evidence: (1) Qu's asylum application; (2) Qu's identification card, birth certificate, and passport; (3) a family picture; (4) a household document; (5) a letter from Qu's parents corroborating Qu's factual allegations; (6) Qu's parents' identification documents; (7) a summons certificate, dated November 18, 2005, requesting that Qu appear before the Lianjian County Public Security Bureau for the unsettled debt case; (8) "I.O.U." notes made out to Zhang, dated March 6, 2005 and March 8, 2005, listing Qu's parents, Liquan and Yiquan Qu, as the borrowers; (9) letters from Zhang dated June 12, 2005, August 24, 2005, and January 1, 2006 demanding that Qu's parents repay their debt, indicating that they could have Qu marry Zhang instead, and threatening to "destroy [their] home and vanish [their] family," (J.A. at 156); (10) the U.S. Department of State's 2005 Country Reports on Human Rights Practices in China; and (11) the U.S. Department of State's 2005 International Religious Freedom Report in China.

Qu testified that she feared returning to China because Zhang would harm her and government authorities would punish her for leaving the country without permission. According to Qu, she could not relocate in China, because Zhang would search for her everywhere. Eventually he would find her and either keep her hostage or sell her. The IJ issued an oral decision finding Qu to be credible, but nonetheless finding her to be removable as charged and denying Qu's application for asylum, withholding of removal, and CAT protection. In a supplemental decision, dated January 4, 2007, the IJ *sua sponte* reopened the proceedings and granted Qu's application for asylum. DHS appealed the IJ's order. On January 13, 2009, the BIA overturned the IJ's decision and ordered that Qu be removed from the United States to China. On February 4, 2009, Qu timely filed a petition for review to this Court.

**DISCUSSION**

**I. Standard of Review**

When the BIA issues its own opinion rather than summarily adopts the findings of the IJ, this Court reviews the decision of the BIA as the final agency determination. *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007). This Court reviews the BIA's decision using the substantial-evidence-on-the-record standard, which requires this Court to uphold the BIA's decision unless it is "manifestly contrary to the law." *Castellano-Chacon v. INS*, 341 F.3d 533, 552 (6th Cir. 2003) (internal citation omitted); *see also Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008). Under the substantial evidence standard, this Court will uphold administrative findings of fact unless the Court finds that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). This Court reviews legal conclusions of the BIA *de novo*, *Patel v. Gonzales*, 432 F.3d 685, 692 (6th Cir. 2005), but defers to the agency's reasonable interpretations of its own precedents. *Aburto-Rocha v. Mukasey*, 535 F.3d 500, 503 (6th Cir. 2008).

**II. Asylum**

The Attorney General has discretion to grant asylum to a refugee who shows that she has suffered past persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion," or that she has a well-founded fear of future persecution on these grounds. 8 U.S.C. § 1101(a)(42). "Persecution 'requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty.'" *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998)). To show a well-founded fear of future persecution, an applicant must demonstrate:

> (1) that [s]he has a fear of persecution in [her] home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering

such persecution if [s]he were to return to that country; and (3) that [s]he is unable or unwilling to return to that country because of such fear.

*Id.* (quoting *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004)). An applicant who establishes that she has suffered past persecution is presumed to have a well-founded fear of future persecution. The government may rebut this presumption by showing, by a preponderance of the evidence, that conditions in the country have changed so fundamentally that the applicant no longer has a well-founded fear of future persecution. *Id.* (citing *Pilica*, 388 F.3d at 950; *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003)).

## A. Particular Social Group

To establish eligibility for asylum, Qu must first show that she was a member of a particular social group for asylum purposes. In *Castellano-Chacon*, 341 F.3d at 546-47, this Court adopted the BIA's definition of "particular social group" set out in *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985). In *Acosta*, the BIA defined "particular social group" as follows:

> [W]e interpret the phrase 'persecution on account of membership in a particular social group' to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as a former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. . . . By construing 'persecution on account of membership in a particular social group' in this manner, we preserve the concept that refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, [to change] to avoid persecution.

*Acosta*, 19 I. & N. Dec. at 233-34.

"Courts of Appeals have deferred to *Matter of Acosta's* broad interpretation of 'particular social group' as encompassing any group, however populous, persecuted

because of shared characteristics that are either immutable or fundamental." *Hong Ying Gao v. Gonzales*, 440 F.3d 62, 67 (2d Cir. 2006), *vacated and remanded on other grounds by Keisler v. Hong Yin Gao*, 552 U.S. 801 (2007). The term "'particular social group' is broad enough to encompass groups whose main shared trait is a common one, such as gender, at least so long as the group shares a further characteristic that is identifiable to would-be persecutors and is immutable or fundamental." *Id.* at 64.

Under the facts of this case, it appears that Qu has shown that she was a member of a particular social group of women in China who have been subjected to forced marriage and involuntary servitude. The 2005 Department of State's country report on China, which Qu submitted in support of her asylum application, supports the finding that women who are victims of trafficking on account of their sex are an identifiable and visible group in China:

> The law prohibits trafficking in women and children; however, trafficking in persons and the abduction of women for trafficking remained serious problems . . . Most trafficking was internal for the purpose of providing lower middle income farmers with brides or sons. Some cases involved trafficking of women and girls into forced prostitution in urban areas, and some reports suggested that certain victims . . . were sold into forced labor.

(J.A. at 227). According to the country report, the Ministry of Public Security statistics show that during the first ten months of 2005, there were 1,949 reported cases of trafficking involving women and children and 3,574 women and children rescued.

While the factual scenario of the instant case deviates from the typical trafficking case, Qu still shares the common, immutable characteristic of being a woman who has been abducted by a man trying to force her into marriage in an area where forced marriages are recognized. *See Gao*, 440 F.3d at 70 (finding women who have been sold into marriage in a part of China where forced marriages are valid and enforceable to be members of a particular social group). *See also Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005) (determining that Somalian females potentially subject to female genital mutilation qualify as a social group); *Niang v. Gonzales*, 422 F.3d 1187, 1200 (10th Cir. 2005) (concluding that gender or membership in a tribe is sufficient to

constitute a social group).  Unlike cases in which women fear being forced into marriage or prostitution because they have been threatened by potential perpetrators and it is a common practice in their country, Qu has suffered a severe form of the practice–she was kidnapped for two weeks until she escaped, her perpetrator attempted to rape her, and he threatened to send her to prison if she did not marry him.[1]  Accordingly, under the definition laid out in *Acosta* as applied to this case, the record shows that Qu would classify as a member of a particular social group.

## B.  "On Account Of"

Qu must next show that she was targeted "on account of" her membership in the group of women in China who have been subjected to forced marriage and involuntary servitude.  *See Elias-Zacarias*, 502 U.S. at 483 (requiring an asylum applicant to prove that he has a well-founded fear that the guerrillas in his home country would persecute him because of the political opinion that formed the basis of his membership in a particular social group, rather than because of his refusal to fight with them).

Qu's situation represents a mixed motive case.  Based on Qu's testimony, which the IJ found credible, it is clear that Zhang targeted Qu both to secure the repayment of his loan from Qu's father *and* because she was a woman whom he could force into marriage in a place where forced marriages are accepted.  To prove that she was persecuted on account of her membership in a particular social group, Qu need only show that Zhang was motivated to abduct her, at least in part, on account of an enumerated ground.  *In re V-T-S*, 21 I. & N. Dec. 792, 798 (BIA 1997) ("While there may be a number of reasons for a kidnapping, the respondent bears the burden of establishing that one motivation was to persecute h[er] on account of an enumerated ground."); *Al-Ghorbani v. Holder*, 585 F.3d 980, 997 (6th Cir. 2009) ("when an applicant demonstrates that he or she 'was persecuted on the basis of more than one factor,' the applicant is eligible for asylum or the withholding of removal 'so long as one

---

[1]In the instant case, we do not address whether a woman who has been threatened and is apprehensive about being forced into marriage or involuntary servitude in China, but who has not actually experienced the practice, would classify as a member of a particular social group for purposes of asylum.

of those factors is a protected ground under the INA'") (quoting *Marku v. Ashcroft*, 380 F.3d 982, 988 n.10 (6th Cir. 2004)). Furthermore, if there is a nexus between the persecution and the membership in a particular social group, the simultaneous existence of a personal dispute does not eliminate that nexus. *See Gao*, 440 F.3d at 70 (finding that the petitioner was persecuted "on account of" her membership in the particular social group of women who have been sold into marriage despite the fact that her claim arose from a broken contract for marriage, which created a dispute between two families).

## C. Future Persecution

Finally, Qu must show that there is a reasonable possibility that she would suffer future persecution if she were to return to China and that she is unable or unwilling to return to that country because of her fear. By establishing that she has suffered past persecution, Qu is presumed to have a well-founded fear of future persecution. The government has not attempted to rebut this presumption by showing that conditions in the country have changed so fundamentally that Qu no longer has a well-founded fear of future persecution. Furthermore, Qu testified that Zhang threatened her by saying he would get her wherever she went because he had powerful connections with the police. She also testified that she feared returning to China because Zhang would harm her and government authorities would punish her for leaving the country without permission. The testimony concerning Zhang's status in the underground world and his powerful connections with the police, combined with the fact that Qu's family was unable to secure her release during the two week period that she was held captive, provide circumstantial evidence that the government is unable or unwilling to control Zhang.

## D. Disposition

Although Qu seems to have made the requisite showing that she is a member of a particular social group for asylum purposes, the BIA did not make an explicit finding on the issue, but rather appeared to base its denial of asylum on the fact that Qu was not targeted in part on account of her gender. The BIA seemed to view the entire matter as

simply a debt collection dispute. (J.A. at 3). When the BIA does not fully consider an issue, as in the instant case, the Supreme Court has instructed that a reviewing court "is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed." *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (internal citation and quotation marks omitted). Rather, "the proper course, except in rare circumstances, is to remand to the [BIA] for additional investigation or explanation." *Id.* (internal citations and quotation marks omitted).

Accordingly, we will remand to the BIA for consideration of whether Qu classifies as a member of a particular social group for purposes of asylum. If the BIA concludes that Qu is a member of a particular social group for purposes of asylum, substantial evidence on the record does not support its finding that Qu has not fulfilled the requirements for establishing asylum.

## III. Convention Against Torture

The BIA denied Qu's claim for CAT protection on the basis that she did not present any arguments on appeal as to why the BIA should reverse the IJ. The BIA did not address the merits of the claim.

When an immigrant fails to exhaust her administrative remedies, 8 U.S.C. § 1252(d)(1) forecloses judicial review. *See Hasan v. Ashcroft*, 397 F.3d 417, 419-20 (6th Cir. 2005); *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004). For an immigrant to exhaust her administrative remedies, she must properly present her claim to the BIA. *Ramani*, 378 F.3d at 559. "The purpose of Section 1252(d)(1)'s exhaustion requirement is (1) to ensure that . . . the agency responsible for construing and applying the immigration laws and implementing regulations, has had a full opportunity to consider a petitioner's claims; (2) to avoid premature interference with the agency's processes; and (3) to allow the BIA to compile a record which is adequate for judicial review." *Id.* (internal citations and quotation marks omitted).

The appeal before the BIA was taken by the government, not Qu, after the IJ issued a supplemental order granting Qu asylum. The only issue that the government

raised on appeal was the grant of Qu's asylum claim. The IJ's supplemental order left intact those legal conclusions from the initial order that were not modified in the supplemental order. Thus, the denial of Qu's claim for CAT protection in the initial order was left undisturbed. However, given the interplay between the two orders issued by the IJ and the unusual procedural posture of the case, it would not have been clear that Qu had to argue the CAT issue in detail in her responsive briefs to the government's asylum appeal. All of the cases cited by the government in which Section 1252(d)(1) foreclosed judicial review involve situations in which a petitioner initiated the appeal before the BIA but failed to properly argue the issue that he or she raised. *See, e.g., Khalili v. Holder*, 557 F.3d 429, 433 (6th Cir. 2009); *Hasan*, 397 F.3d at 420; *Ramani*, 378 F.3d at 557. In fact, Qu "presented" the claim in response to the government's appeal by citing to the CAT law and arguing that she had a well-founded fear of torture. *See Ramani*, 378 F.3d at 559.

Furthermore, it is not clear from the record that Qu does not have a viable CAT claim. "Under CAT, removal must be withheld if it is more likely than not that [the applicant] would be tortured if removed to the proposed country of removal . . . An applicant for relief need not show that the harm she [or he] faces is based on one of the five grounds . . . required under the INA, but rather must establish a *particularized* threat of torture." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1155 (6th Cir. 2010) (internal citations and quotation marks omitted). The IJ found that Qu credibly testified that Zhang kidnapped her, held her hostage, attempted to rape her, and threatened to cut off her hands and feet if she attempted to escape. Furthermore, as discussed above, Qu credibly testified that Zhang was known as a "big thug" in the underground world, that he threatened her by saying he would get her wherever she went because he had powerful connections with the police, and that her family was unable to secure her release by seeking the intervention of law enforcement officials during the two weeks that he held her captive. Based on this record, Qu may have a viable claim for CAT protection.

However, the BIA declined to analyze the merits of Qu's CAT claim. Since the purposes of Section 1252(d)(1)'s exhaustion requirements include allowing the agency to have a full opportunity to consider a petitioner's claims and to compile a record adequate for judicial review, we will remand to the BIA for consideration of the merits of Qu's claim for CAT protection in the first instance.

## CONCLUSION

Because the BIA's denial of asylum and CAT protection are not supported by substantial evidence, we hereby **VACATE** the BIA's order and **REMAND** for proceedings consistent with this opinion.