**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0327n.06

**No. 17-3587**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

PROKOFI NOZADZE,

      Petitioner,

v.

JEFFERSON B. SESSIONS, III,
Attorney General,

      Respondent.

FILED
Jul 02, 2018
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW FROM
THE BOARD OF IMMIGRATION
APPEALS

---

**BEFORE:** MOORE, CLAY, and KETHLEDGE, Circuit Judges.

**CLAY, Circuit Judge.** Petitioner Prokofi Nozadze seeks review of a decision by the Board of Immigration Appeals ("BIA") denying his application for asylum pursuant to 8 U.S.C. § 1158 and 8 C.F.R. § 1208.13(b)(1)(iii); withholding of removal, pursuant to § 241(b)(3) of the Immigration and Nationality Act; and withholding of removal under Article III of the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46 ("CAT"). For the following reasons, we **DENY** the petition for review.

## BACKGROUND

These proceedings have been underway for nearly fifteen years. The factual background was set forth succinctly in the administrative proceedings below, as follows:

> [Petitioner] was a minibus driver in Georgia. While driving his routes, he began to notice what he believed to be corrupt activities between Georgian soldiers and Chechen "bandits." He voiced his concerns to other members of his political party, the Citizens' Union of Georgia ("CUG"). When his concerns were ignored, [Petitioner] wrote a letter detailing what he had seen to the government's "Regional Security Chief." [Petitioner] was summoned to the security office on September 3, 2001. Upon arrival, he was told to "be quiet" about what he had witnessed during his bus routes, and that it was none of his business. [Petitioner], however, continued to insist that the government should prevent the acts of corruption between rebels and the military. [Petitioner] was subsequently taken to a cell and beaten. He testified that he was not fed and that he was so badly injured that he could not get off the floor of his cell. [Petitioner] was released three days later. . . .
>
> Next, in February 2002, [Petitioner]'s life was threatened. He testified that one day, two Chechens and one Georgian soldier boarded his minibus after storing a small mysterious package in the vehicle's luggage compartment. A "monitoring group" consisting of five individuals stopped the bus soon thereafter. Before [Petitioner] had a chance to speak with the monitors, the Georgian soldier told [Petitioner] not to reveal that he and the Chechens were responsible for placing the small package in the luggage compartment. [Petitioner] felt that he "could not lie" to the monitors, and when asked, identified the soldier and his Chechen associates as the owners of the package. The five patrollers then arrested the two Chechens, and "ordered the Georgian military person to go with them." Before leaving, the Georgian soldier turned to [Petitioner] and threated to kill him.
>
> Two months later, in April 2002, [Petitioner] was driving his minibus route when three soldiers and one officer in a Georgian military jeep stopped him. [Petitioner] was instructed to get off the bus. Upon exiting, he was dragged into the woods and beaten until he could not move. Two of the soldiers then set [Petitioner]'s minibus on fire. [Petitioner] postulated that the attack was meant to make good on the threat the Georgian soldier made in February, as [Petitioner] was still driving the same van with the same license plate and markings. Fortunately, [Petitioner] was found by a road patrol the next day and taken to the hospital, where he remained for three days. [Petitioner] reported the incident to the police at the hospital; he was told that an investigation would follow, but nothing came of his report.

[Petitioner] ultimately left the CUG in June 2002. He had attended a party meeting during which the president of Georgia spoke and indicated that some CUG members had been interfering with government work. [Petitioner] believed that this comment was directed at him. After hearing the president's speech, [Petitioner] scheduled a meeting with the head of the CUG. [Petitioner] expressed his "surprise[] and disappoint[ment]" that his own party members did not support him in his quest to fight corruption at the border. He then informed that head of the CUG that he was withdrawing his membership in the CUG. [Petitioner] was told that his leaving "would cause a lot of problems," and that it would be "interesting" if [Petitioner] were to leave the party. Nonetheless, [Petitioner] turned in his membership card and certificate, confirming that he was no longer a member.

The final incident occurred in August 2002. [Petitioner] was dropping off a patron at a railroad station in his new minibus when three CUG members approached him and forced him into a vehicle, threatening to shoot him for noncompliance. They drove him approximately twenty minutes away and beat him with batons. They called him names and said that he "can't leave the party that easy." After beating him, the CUG members forced him to call his wife and have her deliver the equivalent of $10,000 to the CUG headquarters. [Petitioner] was held until the members received confirmation that the money had been received. [Petitioner] was hospitalized for three days as a result of his injuries. [Petitioner] testified that he did not file a police report because, based on his past experience filing a report, he felt his complaint would be ignored.

(A.R. 261–63 (internal citations omitted).)

Following the above-described events, Petitioner and his wife came to the United States. On August 14, 2003, the government initiated removal proceedings. Petitioner conceded that he was unlawfully living in the United States, and he applied to remain in the country through various means, including asylum, withholding of removal, and the CAT. The government eventually held removal proceedings in May 2012 and issued a denial of Petitioner's application on all grounds later that year. Petitioner appealed to the BIA, which remanded for additional proceedings. Following these proceedings, however, the government again denied Petitioner's application, and it ordered Petitioner's removal to Georgia. Petitioner again appealed to the BIA, but this time the BIA dismissed his appeal in a written decision. Petitioner then filed this timely request for review.

**DISCUSSION**

**A. Standard of Review**

This Court reviews the decision of the BIA as the final agency determination under the substantial evidence standard where, as here, "the BIA issues its own opinion rather than summarily adopt[ing] the findings of the IJ." *Bi Xia Qu v. Holder*, 618 F.3d 602, 605 (6th Cir. 2010) (citing *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007)). "To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citing *Patel v. Gonzales*, 470 F.3d 216, 218 (6th Cir. 2006)). The substantial evidence standard requires that this Court uphold the BIA's decision unless it is "manifestly contrary to the law." *Bi Xia Qu*, 618 F.3d at 605 (quoting *Castellano–Chacon v. INS*, 341 F.3d 533, 552 (6th Cir. 2003)); *see also Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008). This Court will uphold administrative findings of fact unless the Court finds that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). Meanwhile, "[t]his Court reviews legal conclusions of the BIA *de novo* but defers to the agency's reasonable interpretations of its own precedents." *Bi Xia Qu*, 618 F.3d at 606 (internal citations omitted).

**B. Refugee Asylum**

Petitioner first requests review of the BIA's denial of his application for refugee asylum. The Attorney General has discretion to grant asylum to an alien who qualifies as a refugee under the Immigration and Nationality Act (the "Act"), 8 U.S.C. § 1101, *et seq. See Elias-Zacarias*, 502 U.S. at 481; *Bi Xia Qu*, 618 F.3d at 606. As relevant to this case, the Act defines a refugee as an alien who is unable or unwilling to return to his or her home country because of "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social

group, or political opinion." *See* 8 U.S.C. § 1101(a)(42)(A); *Elias-Zacarias*, 502 U.S. 478 at 481; *Bi Xia Qu*, 618 F.3d at 606. A petitioner is presumed to have a well-founded fear of future prosecution if the petitioner shows that he or she has suffered such persecution in the past. 8 C.F.R. § 208.13(b)(1); *see Bi Xia Qu*, 618 F.3d at 606. The government "may rebut this presumption by showing, by a preponderance of the evidence, that conditions in the country have changed so fundamentally that the applicant no longer has a well-founded fear of future persecution." § 208.13(b)(1); *see Bi Xia Qu*, 618 F.3d at 606 (citing *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005)). One example of a fundamental change is the ouster of the political regime responsible for the petitioner's prior political persecution. *See Liti v. Gonzales*, 411 F.3d 631, 639 (6th Cir. 2005) (citing cases), *superseded by statute on other grounds as stated in Marikasi v. Lynch*, 840 F.3d 281 (6th Cir. 2016).

Absent a presumption created by past persecution, or where the government rebuts such a presumption, the applicant has the burden of proof to establish that he or she has a well-founded fear of future persecution based on current circumstances. *See* 8 C.F.R. § 208.13(b) (allowing an applicant to qualify for asylum "*either* because he or she has suffered past persecution *or* because he or she has a well-founded fear of future persecution" (emphases added)); *Liti*, 411 F.3d at 639. This Court has previously described this burden as follows:

> An alien may establish a well-founded fear of future persecution by demonstrating: (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear. A well-founded fear of persecution thus has both a subjective and an objective component: an alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an "objective situation" under which his fear can be deemed reasonable. A well-founded fear of persecution does not require the applicant to show that he probably will be persecuted if he is deported; one can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.

*Pilica v. Ashcroft*, 388 F.3d 941, 950–51 (6th Cir. 2004) (citing and quoting 8 C.F.R. § 208.13(b)(2)(i); *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998); and *Perkovic v. INS*, 33 F.3d 615, 620–21 (6th Cir. 1994)) (internal quotation marks and alterations omitted).

In this case, the BIA's denial of Petitioner's application for refugee asylum is supported by substantial evidence. The BIA first found that Petitioner is entitled to a rebuttable presumption of a well-founded fear of future persecution. The BIA noted that Petitioner "twice suffered a deprivation of liberty, was badly beaten three times, he was extorted, his minibus was destroyed, and his life was threatened." (A.R. 263.) Further, Petitioner was "(1) harmed and detained by the government because of his report to the Regional Security Chief; (2) harmed and kidnapped by the CUG in part for his decision to leave the party; and (3) assaulted by members of the Georgian military based upon what may have been a random act of violence." (*Id.* (quoting prior BIA decision).) The BIA concluded that each of these incidents was motivated at least in part by Petitioner's political opinion insofar as Petitioner had voiced his opposition to corruption. The BIA also addressed "the somewhat perplexing identity of [Petitioner]'s persecutors," concluding that both the CUG and the Georgian government could be described as responsible for the persecution against Petitioner because the two entities "were effectively one and the same" at the time of Petitioner's persecution.[1] (A.R. 266–67.) Neither party contests these findings of fact or

---

[1] Petitioner raises several arguments based on the premise that he "was found to have been persecuted not only by CUG but also, separately . . . that he was persecuted by the Georgian government." (*See, e.g.*, Pet. Br. 15.) All of these arguments fail for the same reason: the BIA did not find that Petitioner was persecuted by two distinct entities; it found that a single entity—comprised of the CUG *acting as* the Georgian government—was responsible for Petitioner's persecution.

the BIA's corresponding legal conclusion that Petitioner is entitled to a rebuttable presumption of a well-founded fear of future persecution.

The BIA next found that the government is able to rebut this presumption. This determination, which Petitioner challenges, is supported by substantial evidence. To show that conditions in Georgia have undergone a fundamental change such that Petitioner's fear of persecution based on past persecution is no longer well-founded, the government offered evidence that Georgia has undergone two major political transformations since Petitioner suffered persecution at the hands of the CUG. The record shows that the CUG divided into several factions in the early 2000s and no longer exists as a political party in Georgia. One of the factions, known as the United National Movement ("UNM"), replaced the CUG as the governing party after campaigning against the CUG's corrupt and anti-democratic practices. The UNM was subsequently ousted in 2012 by a "pro-NATO, western-oriented coalition" called the Georgian Dream Movement ("GD"). (A.R. 186.) The record shows that Georgia has experienced the "near-eradication of low-level corruption in state services" as a result of these political changes (A.R. 206–07) and that the transition from the UNM to the GD was the country's "first peaceful transfer of power through voting." (A.R. 186). Indeed, 77% of Georgians now "believe their government has been effective or extremely effective in fighting corruption." (A.R. 206–07.) Substantial evidence therefore supports the BIA's conclusion that the CUG was ousted both in spirit and in name.

The circumstances of this case are analogous to those that this Court encountered in *Liti*. *See Liti*, 411 F.3d at 631. In *Liti*, two individuals fled communist Albania after being repeatedly arrested and jailed for participating in anti-communist activities. *See id.* at 634–35. Albania's communist regime was then ousted, and the new leadership abandoned communism. *See id.* The

two individuals applied for asylum and withholding of removal in the United States, asserting that they feared persecution based on their past experience with the communist government. *See id.* at 635. The BIA denied the application for asylum because the applicants' politically motivated persecution was committed at the hands of a government that was no longer in power, and this Court agreed that the government's evidence of the fall of the Communist party was sufficient to shift the burden back to the applicants to "demonstrate a well-founded fear of future persecution *notwithstanding the political change* which has occurred in Albania since they left in 1990." *Id.* at 635, 639 (emphasis added). The government's evidence of the CUG's downfall in this case leads to the same conclusion, shifting the burden back to Petitioner to show a well-founded fear of future persecution notwithstanding the political change that has occurred in Georgia since he experienced persecution in the past.

Petitioner insists that the BIA's determination is not supported by substantial evidence because "many senior [CUG] people are still in positions of power." (Pet. Br. 16; *see also id.* at 20 ("The new government is filled with former CUG politicians.").) But we rejected this same argument in *Liti*, finding inconsequential the applicants' unsupported assertion that Albania's new government was "comprised of the same people who were in power during the communist regime or their descendants." *Liti*, 411 F.3d at 635. Petitioner does not provide a persuasive basis to differentiate his argument from that made in *Liti*; the record simply does not support Petitioner's argument that the new government is the "[s]ame people, different name." (Pet. Br. 20.)

Finally, with the burden shifted back to Petitioner, the BIA found that Petitioner fails to demonstrate a well-founded fear of future persecution despite the downfall of the CUG. This determination, too, is supported by substantial evidence. An applicant might have a well-founded fear of future persecution despite the collapse of the party responsible for his persecution if, for

example, specific party leaders known to be hostile to the applicant continue to wield power in the new government, or if the new government, despite reforming in other ways, has maintained the prior regime's practice of persecuting those who share the applicant's political opinions. In this case, however, Petitioner failed to submit any such evidence, and the record shows that the CUG's influence today is limited. Petitioner now makes the unsubstantiated assertions that the "CUG is reconstituted in power but only not in the name 'CUG,'" and "the country conditions are really not changed[.]" (Pet. Br. 20.) Petitioner attempts to bolster this claim with record evidence showing that senior positions in the Ministry of the Interior and in the Prosecutor General's office of the current government "went to figures known for their ties to some of the most corrupt and pro-Russian politicians in the Shevardnadze [CUG] era." (A.R. 126.) But rather than supporting Petitioner's position, this evidence demonstrates just how thoroughly the CUG-era government has been dismantled; that is, very few senior government officials in Georgia today even have *ties* to the former CUG. Petitioner further suggests that these officials "are the ones that persecuted [Petitioner], members of Citizens' Union of Georgia (CUG)," (Reply at 3), but there is no evidence in the record to suggest that any of the current government officials—who merely have ties to the former CUG—served in the CUG-era government or, more importantly, that such officials have ever supported the persecution of citizens who, like Petitioner, oppose corruption. The record supports the BIA's finding that the party responsible for Petitioner's persecution was ousted after Petitioner came to the United States. Thus, Petitioner's argument on appeal is unpersuasive, and we decline to review the BIA's determination with regard to Petitioner's application for refugee asylum.

## C. Humanitarian Asylum

Petitioner next requests review of the BIA's denial of his application for humanitarian asylum. In the absence of a well-founded fear of future persecution, an applicant may nevertheless

be eligible for a discretionary grant of humanitarian asylum if he or she "has suffered under atrocious forms of persecution." *Ben Hamida v. Gonzales*, 478 F.3d 734, 740 (6th Cir. 2007) (quoting *Matter of Chen*, 20 I. & N. Dec. 16, 19 (BIA 1989)). This rule is set forth in immigration regulations, which provide:

> An applicant described in paragraph (b)(1)(i) of this section who is not barred from a grant of asylum under paragraph (c) of this section, may be granted asylum, in the exercise of the decision-maker's discretion, if:
>
> > (A) The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or
> >
> > (B) The applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country.

8 C.F.R. § 1208.13(b)(1)(iii). Under the first prong, "humanitarian asylum grants on account of past persecution are reserved for only the most severe cases and should only be granted if the 'past persecution was so severe that returning the alien to his or her native country would be inhumane.'" *Lleshi v. Holder*, 460 F. App'x 520, 525 (6th Cir. 2012) (quoting *Klawitter v. I.N.S.*, 970 F.2d 149, 153 (6th Cir. 1992)). Examples of severe cases where discretionary asylum may be granted under the first prong of § 1208.13(b)(1)(iii) include, among others, "the German Jews, the victims of the Chinese 'Cultural Revolution', [and] survivors of the Cambodian genocide.'" *Id.* (quoting *Hana v. Gonzales*, 157 Fed. App'x. 880, 884 (6th Cir. 2005)). Meanwhile, discretionary grants of asylum under the second prong of the regulation are reserved for "cases where it is appropriate to offer protection to applicants who have suffered persecution in the past and who are at risk of future harm that is not related to a protected ground." *Liti*, 411 F.3d at 642 (quoting 63 Fed. Reg. 31945, 31947 (June 11, 1998)). Thus, "other serious harm" in this context means "harm that is *not* inflicted on account of race, religion, nationality, membership in a particular social group, or

political opinion, but is so serious that it equals the severity of persecution." 65 Fed. Reg. 76121–01, 76127 (Dec. 6, 2000) (emphasis added).

In this case, Petitioner argues that the BIA erred in two ways when it denied his application for humanitarian asylum. Neither argument has merit. *First*, Petitioner argues that the BIA erroneously denied his application under the first prong, which permits a grant of discretionary asylum based on "the severity of the past persecution." § 1208.13(b)(1)(iii)(A). Specifically, Petitioner argues that the BIA elevated the regulation's requirements, requiring Petitioner to show that he was the victim of a "systemic genocide-type atrocity as what occurred to the German Jews, the Cultural Revolution and the Cambodian genocide," rather than conducting an "individualized analysis of what occurred personally to [Petitioner]." (Pet. Br. 23.) Petitioner's argument fails because it relies on a mischaracterization of the BIA's decision. The BIA conducted precisely the type of individualized review that Petitioner requests, and it applied the correct standard when doing so. In reviewing Petitioner's application for humanitarian asylum, the BIA examined Petitioner's past persecution in Georgia, noting that it consisted of "beatings, threats, extortion, and deprivation of liberty during separate incidents," before reasonably concluding that such persecution "does not reach the level of severity described by the Board in our precedent decisions or by the Sixth Circuit in their discussion of this issue." (A.R. 6 (citing cases).) Although some of the prior cases that the BIA cited refer to victims of "systemic atrocities," the BIA correctly noted that humanitarian asylum "is discretionary," "is reserved for extreme cases," and "is only granted where it would be 'inhumane' to return the alien to his native country." (A.R. 62.) Petitioner's argument that the BIA applied an incorrect legal standard under § 1208.13(b)(1)(iii)(A) therefore fails.

*Second*, Petitioner argues that the BIA should have granted him asylum under the second prong of the regulation, which permits a discretionary grant of asylum upon a showing of "a reasonable possibility that [the applicant] may suffer other serious harm upon removal to that country." § 1208.13(b)(1)(iii)(B). Petitioner argues that he would be subject to "other serious harm" based on his political beliefs if he were removed to Georgia because "corruption is still a huge problem." (Pet. Br. 25.) In support, Petitioner cites reports of "violence against dissenting political opinions" in Georgia. (*Id.*) But the BIA correctly found this argument to be inapposite. Petitioner misapprehends § 1208.13(b)(1)(iii)(B), treating it as another mechanism by which he might demonstrate a well-founded fear of future persecution based on his political beliefs. The regulation instead codifies the government's discretion to provide asylum to those who may suffer "*other* serious harm"—that is, "harm that is *not* inflicted on account of . . . political opinion." 65 Fed. Reg. 76121–01, 76127 (Dec. 6, 2000) (emphases added); *see Liti*, 411 F.3d at 642. Accordingly, Petitioner's argument under § 1208.13(b)(1)(iii)(B) has no merit, and we decline to review the BIA's denial of Petitioner's application for humanitarian asylum.

## D. Convention Against Torture

Finally, Petitioner asserts that he is entitled to withholding of removal under the CAT. The standard for obtaining protection under the CAT differs from that of asylum in that it "is *not* conditioned on proof that the alien would be persecuted on a protected ground." *Kamar v. Sessions*, 875 F.3d 811, 820 (6th Cir. 2017) (emphasis added). Instead, an applicant must make a separate showing that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

Petitioner failed to properly invoke the CAT below. Petitioner asserted that the very same evidence that purportedly demonstrated his well-founded fear of political persecution also provided grounds for withholding of removal under the CAT. But political persecution may or

may not involve torture. Therefore, evidence of political persecution, regardless of its persuasiveness, is insufficient to support relief under the CAT. *See Kamar*, 875 F.3d at 820. In order to succeed under the CAT, Petitioner was required to make an independent showing that he would likely be tortured upon removal. *Id.* Petitioner failed to do so.

Petitioner now raises a different argument, asserting that CAT relief is warranted "as a matter of law" because the record evidence "is replete with examples of torture by the Georgian government" and because "public officials in Georgia are complicit in or are willfully blind to the torture of political or other opponents." (Pet. Br. 29–30.) But Petitioner forfeited this argument in his administrative proceedings by failing to raise it, and this Court therefore has no discretion to entertain it. *Ramani v. Ashcroft*, 378 F.3d 554, 559 (6th Cir. 2004) ("[F]ailure to raise, on such an appeal, a particular question concerning the validity of the order constitutes a failure to exhaust administrative remedies with regard to that question, thereby depriving a court of appeals of jurisdiction to consider that question."). We therefore deny Petitioner's request for review of the BIA's denial of relief under the CAT.

## CONCLUSION

We **DENY** Petitioner's request for review.