NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0195n.06

Case No. 25-3736

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Apr 29, 2026

KELLY L. STEPHENS, Clerk

JULIO FRANCISCO SEBASTIAN;
A.A.F.B.,

     Petitioners,

v.

TODD W. BLANCHE, Acting U.S.
Attorney General,

     Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON PETITION FOR REVIEW FROM
THE UNITED STATES BOARD OF
IMMIGRATION APPEALS

OPINION

Before: SUTTON, Chief Judge; DAVIS and RITZ, Circuit Judges.

**RITZ, Circuit Judge.** Julio Francisco Sebastian and his minor child applied for asylum, withholding of removal, and protection under the Convention Against Torture. An immigration judge denied the claims, and the Board of Immigration Appeals affirmed. We deny Francisco's petition for review.

**BACKGROUND**

**I.**    **Factual background**

Francisco is a native and citizen of Guatemala who, with his minor son, entered the United States without documentation in December 2017.[1] Francisco identifies as Chuj, an indigenous Mayan people, and his native language is Chuj San Sebastian. Although Francisco learned Spanish at school, he and other indigenous students were punished and ostracized there because of their

---

[1] References to Francisco throughout this opinion include his minor son, who was included on Francisco's asylum application.

ancestry. Francisco further testified that he was molested by one of his teachers when he was eleven years old because he was indigenous. He did not testify as to any interactions with this teacher in the years after the alleged assault.

Later in his life, Francisco had several run-ins with gang members in Guatemala. In January 2017, he was approached by four gang members while he was shopping. The gang members pointed a knife at him and said, "Give me everything that you have." AR 154, Hr'g Tr. They then took his money and the items that he had purchased, telling him that they would kill him if he reported the robbery to the police. Francisco reported the incident to the police anyway, but an officer laughed at him and declined to help.

Next, in April 2017, five or six gang members approached Francisco while he was waiting for a bus. They beat him, pointed a knife and pistol at him, and said, "We know you. We know who you are. . . . We know where you come from. We know you have money. Give us the money." *Id.* at 155. Francisco did not report this incident to the authorities.

Finally, while he was shopping in August 2017, Francisco received at least two phone calls from gang members in close succession. During the first call, the callers told him that they knew who he and his family were and that he had money with him. They also told him that if Francisco did not do as the callers said, they would kill him or one of his family members. During the next call, the callers again told Francisco that they knew who he was and that they wanted his money. They added that they were following him. Francisco "got really scared." *Id.* at 158.

Francisco testified that the callers called again while he was in a store and said, "[W]e know right now that you're at the store buying equipment . . . so you need to pay us some money." *Id.* at 159. Francisco borrowed money from a friend in the United States and deposited it into a bank account as instructed by the caller. But he did not report these calls to the police.

Within a few months of these phone calls, Francisco left Guatemala with his son and traveled to the United States. His wife and their two other children continue to live in Guatemala, where they have not been harmed or contacted by gang members.

## II.     Procedural background

Francisco and his son entered the United States on December 5, 2017, after crossing the border at Nogales, Arizona. The next day, the Department of Homeland Security issued Francisco a notice to appear. The notice charged him with removability as an arriving noncitizen lacking valid documentation at the time of seeking entry. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I). Francisco admitted the factual allegations in the notice and conceded the charge of removability. His pleadings stated that his best language was "Chuj San Sebastian" and requested an interpreter in that language. AR 384, Written Pleadings.

### A.     Proceedings before the Immigration Judge

Francisco filed an application for asylum, withholding, and protection under the Convention Against Torture ("CAT"). He claimed relief based on his indigenous race and membership in the particular social group of "Guatemalan Chuj males without police protection." AR 150, Hr'g Tr.; AR 223, Supp. B. His application included declarations from two witnesses: Salomon Jose Diego, who stated that Francisco was extorted and threatened by gang members in August 2017 because "Francisco is a working man, that is why the gangs follow him; because he is always trying to get ahead," AR 227, Diego Decl.; and David Sebastian Miguel, who stated that Francisco was threatened by gang members in August 2017 because he "is a worker and of good faith," AR 233, Miguel Decl.

Francisco also submitted evidence of country conditions, including the 2019 Department of State Crime and Safety Report ("Safety Report") and the 2018 Department of State Country

Report ("Country Report"). The Safety Report noted that gang extortion in Guatemala is common, affecting "all sectors of society." AR 343, Safety Report. The Country Report noted that indigenous people, who make up 44% of Guatemala's population, are often marginalized, but the government has established police precincts in indigenous-majority communities to reduce violence and establish the rule of law.

On February 18, 2020, an Immigration Judge ("IJ") held a hearing, during which Francisco testified in Chuj San Sebastian through an official Chuj interpreter. The IJ informed Francisco, "If at any time you do not understand a question, do not answer it. Simply tell us that you do not understand." AR 151, Hr'g Tr. Francisco said that he understood. He indicated only one time during the hearing that he did not understand a question, asking, "What was that?"; the IJ repeated the question, which Francisco then answered. *Id.* at 182-83.

The IJ denied Francisco's application for asylum, withholding of removal, and CAT protection. The IJ found that Francisco had testified credibly with respect to some of the events he described but at times had testified inconsistently with his application materials. In particular, the IJ found that Francisco had "embellished" his testimony because he had not previously described his sexual assault in detail, nor detailed the beating he allegedly received in April 2017, and had been inconsistent in his description of the timing of the threatening phone calls he received. AR 101-02, IJ Dec. The IJ also noted that Francisco's witnesses said Francisco had been targeted for reasons other than his indigenous status.

The IJ found that Francisco had failed to establish that "Guatemalan Chuj males without police protection" was a cognizable social group under the Immigration and Nationality Act. *Id.* at 103. Moreover, assuming that Francisco had in fact been sexually assaulted as a child, the IJ found that Francisco had not shown that the assault was on account of a protected ground. And

even if Francisco had been harmed by the teacher on account of his race or ethnicity, circumstances had changed—namely, the passage of time, the fact that Francisco did not see the teacher again, and the lack of evidence that the teacher molested him again—such that Francisco's fear of returning to Guatemala was not objectively reasonable.

Nor, according to the IJ, had Francisco shown that the gangs targeted him on account of a protected ground. Rather, Francisco was targeted by the gangs because he had money. The IJ also found that Francisco failed to show that relocation within Guatemala was unreasonable, because he did not testify as to any harm that took place in his home village and his wife and children continued to live there undisturbed by gangs.

The IJ therefore ruled that Francisco had not shown eligibility for asylum or withholding of removal. As to the CAT, the IJ found that Francisco had not shown that the Guatemalan government or anyone acting with its acquiescence would torture him; at most, he had shown that the police did not respond to his complaints.

## B.   The BIA's ruling

Francisco appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), which affirmed in August 2025. As an initial matter, the BIA noted that its Practice Manual limited briefs to 25 pages, unless a motion to increase the page limit is filed. Francisco, without moving to increase the page limit, had filed a 27-page brief and attached additional documents. The BIA stated that it would not consider the additional documents because Francisco had not complied with its Practice Manual.

On the merits, the BIA upheld the IJ's conclusion that Francisco "has not shown that his proposed particular social group is cognizable under the [Immigration and Nationality Act]." AR 4, BIA Dec. Nor had he demonstrated a nexus between his indigenous background and the harm

he suffered from the teacher or the gangs. The BIA also found no clear error in the IJ's determination that there had been a "fundamental change in circumstances" concerning Francisco's sexual-assault claim. *Id.* at 5. With respect to the CAT claim, the BIA held that the IJ did not clearly err in finding that Francisco had failed to show he would be tortured by the Guatemalan government or by anyone acting with its acquiescence. Finally, the BIA rejected Francisco's argument that his due process rights were violated by not allowing him to testify in the Chuj language, because he had in fact done so, through an interpreter, and because he did not raise this issue during the hearing.

## ANALYSIS

On petition for review, Francisco argues that the BIA violated his due process rights in rejecting his overlarge brief and in affirming the IJ's decision despite interpretation issues during his hearing. He also argues that the BIA erred by denying his application for asylum, withholding of removal, and protection under the CAT. None of his arguments have merit.

## I.      Standard of review

We review the BIA's legal determinations de novo and its factual findings under the substantial-evidence standard. *Tista-Ruiz de Ajualip v. Garland*, 114 F.4th 487, 495 (6th Cir. 2024). Under the substantial-evidence standard, we "will uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Mazariegos-Rodas v. Garland*, 122 F.4th 655, 664 (6th Cir. 2024) (citation modified). We will reverse a factual finding only if "the evidence not only supports a contrary conclusion, but *compels* it." *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007) (quoting *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004)).

We consider the BIA's decision "the final agency determination" when it issues a "separate opinion." *Zaldana Menijar v. Lynch*, 812 F.3d 491, 497 (6th Cir. 2015) (citation omitted). We "also review the [IJ]'s decision to the extent that the [BIA] adopted it." *Juan Antonio v. Barr*, 959 F.3d 778, 788 (6th Cir. 2020).

## II. Due process claims

We first address Francisco's due-process-related arguments. Francisco argues that the BIA violated his due process rights by rejecting some of his appellate submissions; that there were mistranslations of his testimony before the IJ; and that the IJ and BIA failed to consider country-conditions and human-rights evidence in support of his asylum claim. He also contends that the BIA's affirmance was perfunctory and without analysis. These arguments fail.

### A. The BIA reasonably enforced its appellate-submission rules.

The BIA is authorized to "prescribe procedures governing proceedings before it," 8 C.F.R. § 1003.1(d)(4), and the BIA Practice Manual "provides official guidance to parties and counsel who appear before the BIA," *Bulatovic v. Holder*, 351 F. App'x 978, 980 (6th Cir. 2009). When the BIA creates a requirement and puts it in the Practice Manual, and the "failure to adhere to that requirement could result in rejection or dismissal of a filing, the BIA makes this clear." *Pineda-Guerra v. Bondi*, 161 F.4th 426, 429 (6th Cir. 2025).

Here, everyone agrees that at the time of Francisco's appeal to the BIA, the Practice Manual set a 25-page limit on briefs, and Francisco submitted materials beyond that limit. He now insists that the BIA violated his due process rights by failing to consider his extra pages and attachments, because the Practice Manual grants the board the discretion to consider materials over the limit. (***Id.* at 18-19.**) The discretion to consider additional materials does not, however, *mandate* that the BIA consider them, particularly where, as here, a party was informed of page limits but did not

follow them. **(*See id.* at 18-19 (admitting that Francisco was notified that briefs were limited to 25 pages).)**

Francisco also argues that the BIA's refusal to consider his supplemental materials was arbitrary and capricious. The BIA can act arbitrarily "if it applies the wrong legal standard to the facts before it or fails to explain inconsistent outcomes that aren't readily apparent." *Yousif v. Garland*, 53 F.4th 928, 938 (6th Cir. 2022) (citation modified). Francisco points only to the BIA's "discretion" to consider overlarge submissions and to his belief that the attachments were "central" to his case. CA6 R. 14, Pet'r Br., at 21. He does not argue that the BIA applied the wrong legal standard or failed to explain an inconsistent outcome. As we have concluded, the BIA's discretion to consider additional materials does not *require* it to do so. Francisco cannot demonstrate that the BIA acted arbitrarily and capriciously.

### B.      Francisco failed to exhaust his argument about mistranslation.

Francisco next argues, without citation to the record, that several instances of mistranslation occurred during his hearing before the IJ. But he argued to the BIA only that he was "not allow[ed] . . . to testify in the Chuj language," an argument that the BIA rejected because the transcript demonstrated that Francisco testified in Chuj and that an interpreter translated for him. Francisco's new argument to this court is that he *did* testify in Chuj, but that mistranslations and misunderstandings through the interpreter affected his testimony. He did not raise these issues before the IJ or the BIA and thus failed to exhaust his administrative remedies. *See* 8 U.S.C. § 1252(d)(1). Although § 1252(d)(1) does not limit our jurisdiction, it does create a mandatory claim-processing rule. *Santos-Zacaria v. Garland*, 598 U.S. 411, 417 (2023). Besides, even if Francisco had properly raised these issues below, we cannot locate any misunderstanding or mistranslation in the transcript of the proceeding before the IJ.

**C.** **Francisco cannot show that the IJ and BIA failed to consider country and human rights conditions.**

Francisco argues that the IJ and BIA failed to consider "documentary evidence central to asylum eligibility," such as United Nations, human-rights, and country-conditions reports, "based on page-limit technicalities." CA6 R. 14, Pet'r Br., at 45-46. But these documents were included in the record before the BIA, because Francisco filed them with the IJ in support of his application for asylum. In any event, Francisco does not demonstrate that the IJ and BIA failed to consider these documents or any due process violation with respect to his supporting documentary evidence.

**D.** **The BIA issued a reasoned decision.**

Finally, Francisco contends that the BIA conducted a perfunctory review because it issued a one-sentence affirmance of the IJ's decision that did not include any analysis. But this is incorrect. The BIA issued a four-page opinion that analyzed multiple issues. Francisco has not shown a due process violation here.

**III.** **Asylum and withholding-of-removal claims**

Francisco argues that the BIA erred by denying his application for asylum and withholding of removal. These forms of relief are similar—they protect a noncitizen from removal based on the noncitizen's membership in a protected group. To illustrate, the Department of Homeland Security or the Attorney General may grant asylum to an applicant who proves he is "unable or unwilling to return to" his "country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A). And the Attorney General may not remove a noncitizen to a country if that person's "life or freedom would be threatened in that country because of" his "race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1231(b)(3)(A).

Both asylum and withholding-of-removal claims require an applicant to show a "nexus" between his "risk of persecution in the country of removal" and his "membership in a protected group." *Patel v. Bondi*, 131 F.4th 377, 381 (6th Cir. 2025). To show a nexus, the applicant must present "*some* evidence" that "the government, or persons the government is unwilling or unable to control," sought "to overcome a [protected] characteristic." *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 847 (6th Cir. 2023) (citation modified). "This is a question of motive, not just simple causation." *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019).

The standard for showing a nexus differs for asylum and withholding-of-removal claims. "[A]n asylum claim requires that a statutorily protected ground be 'at least one central reason' for alleged persecution." *Sebastian-Sebastian*, 87 F.4th at 851 (quoting *Guzman-Vazquez v. Barr*, 959 F.3d 253, 270 (6th Cir. 2020)). But a withholding-of-removal "claim requires only that a statutorily protected ground be 'a reason' for alleged persecution." *Id.* (quoting *Guzman-Vazquez*, 959 F.3d at 271). Because "'a reason' is different from—and weaker than—'a central reason,'" *Guzman-Vazquez*, 959 F.3d at 272, an applicant who cannot satisfy the nexus requirement for his withholding-of-removal claim necessarily cannot satisfy the more stringent requirement for his asylum claim.

### A. Persecution by gangs

For purposes of our analysis, we will assume, without deciding, that "Guatemalan Chuj males without police protection" qualifies as a particular social group. AR 103, IJ Dec.; AR 150, Hr'g Tr. Francisco argues that his persecution stemmed from his identity as a member of this group. Specifically, he argues that the gang members called him "Indio," a derogatory term for an indigenous person, and mocked him for his inability to obtain police protection due to his powerlessness. CA6 R. 14, Pet'r Br., at 28. Francisco also claims that the gangs targeted him

because they believed that members of the indigenous community are vulnerable. And he argues that country-conditions evidence demonstrates that indigenous men in Guatemala are "systematically targeted for extortion" because they are believed to be powerless. *Id.* at 29.

The BIA did not err in finding that Francisco failed to establish the requisite nexus between his race or particular social group and the gangs' persecution of him. "A nexus determination is a finding of fact and is thus reviewed under the substantial-evidence standard." *Sebastian-Sebastian*, 87 F.4th at 847. To obtain relief, Francisco needed to show that his status as a Chuj male without police protection was a reason for his persecution. But, as the BIA found, the gangs did not target him based on his indigenous status or his relationship with the police; they targeted him because he had money. We have declined to find a nexus where the petitioner was targeted in his or home country by alleged persecutors seeking money, rather than because of some protected ground. *See, e.g.*, *Ghimire v. Holder*, 525 F. App'x 411, 415 (6th Cir. 2013); *accord Cruz-Guzman*, 920 F.3d at 1037; *Khozhaynova v. Holder*, 641 F.3d 187, 196 (6th Cir. 2011), *abrogated on other grounds by Guerrero-Lasprilla v. Barr*, 589 U.S. 221 (2020).

Francisco argues that, under *Mazariegos-Rodas*, "a protected ground cannot be dismissed as an incidental or tangential reason for the persecution simply because a persecutor might have pecuniary goals." 122 F.4th at 671. But in that case, the persecutors "expressly connected their actions to the Petitioners'" protected status. *Id.* at 672-73. Here, there is no such evidence that the gang members connected their extortion and threats to Francisco's indigenous identity or his proposed social group. When Francisco was approached by gang members while shopping, the gang members did not make any comment about his indigenous identity. They said, variously, "Give me everything that you have," AR 154, Hr'g Tr.; "We know you. We know who you are. . . . We know where you come from. We know you have money. Give us the money," *id.* at 155; and

that they knew his family, *id.* at 157. That gang members knew who Francisco was and where he came from does not inevitably mean that they targeted him based on his indigenous status. Indeed, they did not mention his Chuj background at all.[2]

According to Francisco's own witness statements, he was targeted because he "is a working man . . . always trying to get ahead," and because he "is a worker and of good faith," not because of his indigenous identity. AR 227, Diego Decl.; AR 233, Miguel Decl. His country-conditions evidence, moreover, states that gang extortion in Guatemala is common and affects "all sectors of society." AR 343, Safety Report. Such "[g]eneral conditions of rampant gang violence alone are insufficient to support a claim for asylum." *Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013). Accordingly, we uphold the BIA's rejection of Francisco's gang-related asylum and withholding-of-removal claims.

## B.      Persecution by the teacher

Francisco also contends that the teacher who assaulted him was "motivated by [his] ethnicity and status as a poor, fatherless Chuj boy." CA6 R. 14, Pet'r Br., at 29. A showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). The government may rebut this presumption by showing there is "a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality." *Id.* § 1208.13(b)(1)(i)(A). Changes in a petitioner's "personal circumstances," such as "ag[ing] out" of a threat, can rebut the presumption if the petitioner's fear of future persecution is no longer well-founded. *Dieng v. Holder*, 698 F.3d 866, 873 (6th Cir. 2012) (citation modified).

---

[2] Francisco argues that he testified that gang members called him "Indio," a derogatory term, but he provides no citation to the record for this statement, and we cannot locate any such testimony. CA6 R. 14, Pet'r Br., at 28.

Here, assuming without deciding that the sexual assault by Francisco's teacher constituted past persecution on account of his race, we find that the BIA permissibly concluded that the presumption of future persecution was rebutted by changed circumstances. First, it has been more than two decades since the teacher's sexual assault. Second, Francisco did not demonstrate any continuing threat from the teacher or suggest that he had interacted with this teacher at any point after the assault. The passage of time and lack of interactions make the harm "too remote to constitute a well-founded fear of persecution." *Cristobal v. Holder*, 439 F. App'x 538, 541 (6th Cir. 2011).

Francisco contends that the presumption can be rebutted only if there has been a fundamental change in country conditions "countrywide." CA6 R. 14, Pet'r. Br., at 30. But Francisco relies on outdated authority that discussed a different version of the regulations. *See id.* (citing *Bi Xia Qu v. Holder*, 618 F.3d 602, 606 (6th Cir. 2010) (interpreting a prior version of the regulations)). The current version of the regulations, which the BIA applied here, ask broadly if the applicant has experienced "a fundamental change in circumstances." 8 C.F.R. § 1208.13(b)(1)(i)(A); AR 5, BIA Dec. Aside from relying on outdated law, Francisco offers no basis on which to challenge the BIA's analysis of the changed circumstances with his teacher.

## IV. CAT claim

Francisco's claim for protection under the CAT also fails. To warrant protection under the CAT, the applicant bears the burden of proving it is more likely than not that he will be tortured if sent to the country of removal. 8 C.F.R. § 1208.16(c)(2). To qualify as torture, "severe pain or suffering" must be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." *Id.* § 1208.18(a)(1).

Substantial evidence supports the IJ's determination that Francisco did not warrant protection under the CAT. The only relevant evidence Francisco provides, without citation to the record, is country-conditions material purporting to show that police in Guatemala do not respond to or prevent gang violence and that the police "apparently" shared his "location information" with gangs. CA6 R. 14, Pet'r Br., at 41-42. But Francisco offers no evidence to show that the teacher will harm him in the future or that the police will not protect him from harm, let alone torture, from the gangs. Thus, Francisco is not eligible for protection under the CAT. *See Cristales-de Linares v. Bondi*, 161 F.4th 401, 415 (6th Cir. 2025).

## CONCLUSION

For the foregoing reasons, we deny Francisco's petition for review.