NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0578n.06

No. 08-3165

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 31, 2010**
LEONARD GREEN, Clerk

| | |
|---|---|
| **ABLAYE MBODJ**, | ) |
| | ) ON APPEAL FROM THE |
| *Petitioner*, | ) BOARD OF IMMIGRATION |
| | ) APPEALS |
| v. | ) |
| | ) **O P I N I O N** |
| **ERIC H. HOLDER, JR., ATTORNEY** | ) |
| **GENERAL**, | ) |
| | ) |
| *Respondent*. | |

BEFORE: BATCHELDER, Chief Circuit Judge, and MOORE and COLE, Circuit Judges.

**COLE, Circuit Judge.** Petitioner Ablaye Mbodj, a citizen of Mauritania, petitions the Court

for review of a decision by the Board of Immigration Appeals ("BIA") affirming the denial of his

asylum claim by an Immigration Judge ("IJ"). He argues that the BIA erred in determining that

changed country conditions in Mauritania rebut the presumption of future persecution that otherwise

would be drawn from the past persecution he suffered there. In the alternative, he argues that even

if conditions have changed in Mauritania, the BIA erred in denying him humanitarian asylum.

Because the BIA's changed-conditions determination is supported by substantial evidence and

because the BIA did not abuse its discretion in refusing humanitarian asylum, we **AFFIRM** the

BIA's decision and **DENY** Mbodj's petition.

## I. BACKGROUND

Mbodj was born in 1959 in Mauritania. Before being forced to leave the country, he worked as a fisherman and ferryman and fathered three children. In April of 1989, Mauritanian soldiers came to his house and, on the pretense that he needed protection from the ethnic violence then sweeping the country, transported him to a work camp housing about 150 to 200 people. Conditions in the camp were unsanitary—while he was detained there, there was a diarrhea epidemic that the inmates believed was caused by cholera and that resulted in an unspecified number of deaths—and the detainees were not given enough food. On one occasion, when Mbodj refused to clean up one of the ill inmates' excrement with his bare hands, he was beaten severely by soldiers, leaving him with two permanent injuries: a scar from a soldier's extinguishing a cigarette on Mbodj's skin and a damaged front tooth from being hit with the butt of a soldier's rifle. In his asylum application, Mbodj also claims to have witnessed soldiers beating, torturing, and killing other detainees at the work camp.

After approximately two weeks in the camp, Mbodj and other detainees were taken to the Senegal River, which borders Mauritania, and made to paddle across. He lived in a refugee camp in Senegal until 1994, when he traveled to Dakar, where he worked illegally selling cigarettes and candy and washing cars. He married a Senegalese woman with whom he had two children, but did not attempt to obtain Senegalese citizenship. On or about October 29, 2000, Mbodj traveled to the United States using a false passport and visa, entering the United States via John F. Kennedy International Airport in New York. On April 2, 2001, he filed an affirmative application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), and on April

18, 2003, the Department of Homeland Security served him with a Notice to Appear. At a scheduling hearing on April 27, 2004, he renewed his claims for relief, alleging persecution based on his race, nationality, and membership in a particular social group, and requested voluntary departure if his claims were not granted. His merits hearing was held before the IJ on June 1, 2006.

Following the hearing, the IJ delivered an oral decision holding that, while Mbodj had suffered past persecution, the record demonstrated that conditions in Mauritania since had changed fundamentally, such that Mbodj no longer had a well-founded fear of future persecution. In making this determination, the IJ relied on multiple reports from the U.S. Department of State, dating from 1995 to 2005, which describe the severe intercommunal violence between Moor and Sub-Saharan-African groups that broke out in April 1989 and that resulted in the deportation of tens of thousands of Mauritanian citizens to Senegal.[1] However, the reports also indicate that, while racial tensions continued during this time period, the Mauritanian Government instituted policies in the late 1990s to facilitate the return of refugees; that a sizeable majority of the refugees since have returned; that many of the returnees have been given back their original homes, property, and all or a portion of their land; and that President Sid'Ahmed Taya, who also had been the country's leader during the 1989 violence, was ousted in 2005 in a bloodless coup.

The IJ acknowledged that, while the changed conditions in Mauritania no longer supported a well-founded fear of persecution, it remained within his discretion to grant humanitarian asylum.

---

[1]Mbodj's ethnicity is not entirely clear: while his asylum application states that he is Wolof, he testified before the IJ that he is a member of the Black Moor ethnic group, and in his brief before this Court, he identifies himself simply as "Black Mauritanian." Final determination of this question is unnecessary because our analysis does not hinge on Mbodj's ethnicity.

He declined to grant such relief because Mbodj had been able to work, marry, and have children in Senegal, and could have applied for asylum there, but instead traveled to the United States for economic reasons. The IJ also rejected Mbodj's withholding of removal and CAT claims because of the higher standard of proof required for these forms of relief and denied voluntary departure because Mbodj had not demonstrated by clear and convincing evidence that he had the means and intent to depart the United States.

On January 17, 2008, the BIA affirmed the IJ's decision, holding that "specific findings premised on extensive record evidence" supported the determination that while Mbodj had established past persecution, the presumption of future persecution had been rebutted by changed circumstances in Mauritania. (BIA Decision 1-2.) The BIA also found that Mbodj had not provided sufficient evidence to undermine the IJ's changed-circumstances determination. Mbodj had presented a letter from a friend in Senegal, dated April 10, 2005, that advised him not to return to Mauritania because the situation had worsened there, but the BIA found the letter unpersuasive because it "gave no specifics and did not state the basis for that opinion." (*Id.* at 2.) Similarly, the BIA did not credit Mbodj's testimony that he could be killed because of continuing racial problems in Mauritania or his contention that the State Department Reports were inaccurate and politically motivated. This testimony followed claims in Mbodj's asylum application that returnees who had attempted to reclaim their property had been attacked, tortured, enslaved, imprisoned, and sometimes killed by private citizens and Mauritanian security forces.

Having dismissed Mbodj's challenge to the existence of changed circumstances in Mauritania, the BIA proceeded to address several arguments that Mbodj had not presented. Because

Mbodj had not made any "meaningful appellate arguments" regarding CAT relief or voluntary departure, the BIA deemed them waived. (*Id.*) The BIA assumed for the sake of argument that Mbodj had not waived any arguments that he merited asylum based on a different claim or was eligible for humanitarian asylum based on the severity of the persecution he had suffered, but held that such relief was not warranted. Accordingly, the BIA dismissed Mbodj's appeal.

Mbodj now appeals the BIA's decision. We have jurisdiction over final orders of removal issued by the BIA under 8 U.S.C. § 1252(b).[2]

## II. ANALYSIS

### A. Changed Circumstances

Where the BIA issues a separate opinion adopting the IJ's decision but including supplementary findings, we review the BIA's decision as the final agency determination but also review the IJ's decision to the extent the BIA adopted the IJ's reasoning. *See Koita v. Mukasey*, 314 F. App'x 839, 842-43 (6th Cir. 2009) (citing *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007), and *Patel v. Gonzales*, 470 F.3d 216, 218 (6th Cir. 2006)). In determining whether an applicant has established eligibility for asylum, we assess "whether the administrative determination below is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Id.* at 843 (quoting *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992)). Reversal of the BIA is appropriate "only if the applicant can prove that the evidence compels a contrary

---

[2]Following the withdrawal of Mbodj's former counsel three days before argument, we permitted Mbodj's new counsel to file a supplemental brief and the Government to file a supplemental response.

conclusion." *Id.* (citing *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006)).

An alien may be granted asylum if he demonstrates that he is a "refugee," pursuant to 8 U.S.C. § 1158, which is defined as an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Persecution entails "punishment or the infliction of suffering or harm, but harassment or discrimination without more" does not constitute persecution. *Sako v. Gonzales*, 434 F.3d 857, 862 (6th Cir. 2006) (internal quotation marks omitted). Past persecution gives rise to a rebuttable presumption that the applicant has a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). The Government may rebut this presumption by demonstrating by a preponderance of the evidence that conditions in the applicant's home country have changed so fundamentally that the petitioner's fear of future persecution is no longer well-founded. *Id.* § 1208.13(b)(1)(i)(A). If the Government meets its burden, the burden shifts to the petitioner to demonstrate that his fear is well-founded notwithstanding the changed conditions. *Koita*, 411 F. App'x at 843 (citing *Liti v. Gonzales*, 411 F.3d 631, 639 (6th Cir. 2005)).

Mbodj argues that the IJ and BIA ignored evidence in the record indicating that human-rights abuses and racial and ethnic discrimination remain significant problems in Mauritania, and thereby erred in finding that the Government demonstrated that conditions had changed fundamentally in the country since 1989. As Mbodj correctly notes, Mauritania's human rights record remains poor. The State Department reports attest to continued restrictions on citizens' freedom of speech and association and ability to effect political change; to incidents of illegal searches, arbitrary arrest and

detention, abuse of prisoners, and human trafficking; and to longstanding and widespread discrimination against minority groups. Nonetheless, we are unable to conclude that the evidence in the record before us compels the conclusion Mbodj urges. While the Mauritanian government's human rights record remains poor, Mbodj has not presented any evidence that he bears any particular risk of being persecuted. *See Ali*, 366 F.3d at 410 (agreeing with the Seventh Circuit that "[c]onditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum"); *Castellano-Chacon v. I.N.S.*, 341 F.3d 533, 550 (6th Cir. 2003) (noting that an asylum applicant "must demonstrate more than the existence of a generalized or random possibility of persecution"). Nor has he demonstrated, continued discrimination notwithstanding, that conditions in Mauritania remain ripe for a repeat of the 1989 violence and expulsion of minority groups. To the contrary, all the State Department reports indicate that the government has had policies in place for almost two decades to facilitate refugees' return, and that a sizeable majority of the refugees has found it safe to do so. *Cf. Sall v. Gonzales*, 239 F. App'x 975, 980 (6th Cir. 2007) (noting that State Department reports "'are generally the best source of information on conditions in foreign nations'") (quoting *Sterkaj v. Gonzales*, 439 F.3d 273, 276 (6th Cir. 2006))).[3]

We note that, since the 2005 coup, Mauritania conducted its first democratic presidential

---

[3]Mbodj also argues that the Government failed to show, pursuant to 8 C.F.R. § 1208.13(b)(3)(ii), that internal relocation was a reasonable alternative. This argument misconstrues § 1208.13(b)(3)(ii), which merely states that, where past persecution has been established, there is a rebuttable presumption that internal relocation would not be reasonable. Neither the IJ nor the BIA decision rests on the possibility of internal relocation, but rather on the changed circumstances in Mauritania.

election in March of 2007, had a second military coup in August 2008, and conducted another presidential election in July 2009. *See* United States Department of State, 2009 Country Report on Human Rights Practices for Mauritania, http://www.state.gov/g/drl/rls/hrrpt/2009/af/135965.htm. Neither the IJ nor the BIA considered these events—the last two of which occurred after the administrative proceedings had concluded—in evaluating Mbodj's claims. *Cf. Matte v. Gonzales*, 158 F. App'x 726, 733 (6th Cir. 2005) (remarking on the "increasingly common problem of global events outpacing the asylum review process, resulting in asylum decisions being affirmed on grossly outdated records"). Because of "the 'highly complex and sensitive' nature of the question of changed country conditions," however, we allow the BIA "'the opportunity to address the matter in the first instance in light of its own experience.'" *Khora v. Gonzales*, 172 F. App'x 634, 639 (6th Cir. 2006) (quoting *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 17 (2002)); *see also* 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based . . . ."). If Mbodj believes that subsequent events may impact his asylum claim, the proper course is for him to move the BIA to reopen proceedings pursuant to 8 C.F.R. § 1003.2(c). *See Khora*, 172 F. App'x at 640; *Matte*, 158 F. App'x at 733-34.

## B. Humanitarian Asylum

Mbodj argues in the alternative that, even if the BIA did not err in determining that he no longer has a well-founded fear of persecution, it erred in denying him humanitarian asylum. The Government argues that Mbodj has waived this claim by failing to raise it below. While a petitioner normally must present all reviewable issues to the BIA, if the BIA sua sponte raises and rules on the merits of an issue, as was the case here, the petitioner is deemed to have exhausted his administrative

remedies and not to have forfeited the issue. *See Ly v. Holder*, 327 F. App'x 616, 620 (6th Cir. 2009) (citing *Khalili v. Holder*, 557 F.3d 429, 432-36 (6th Cir. 2009)).

Nonetheless, Mbodj's claim fails. Humanitarian asylum is a form of "extraordinary relief," *Cutaj v. Gonzales*, 206 F. App'x 485, 492 (6th Cir. 2006), that may be granted only where "[t]he applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution," or where "there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country," even in the absence of a well-founded fear of future persecution, 8 C.F.R. § 1208.13(b)(1)(iii). In other words, humanitarian asylum is appropriate only "in rare instances" where the applicant "has suffered under atrocious forms of persecution." *Ben Hamida v. Gonzales*, 478 F.3d 734, 740 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutaj*, 206 F. App'x at 491 (stating that persecution must be "particularly severe" to warrant humanitarian asylum) (internal quotation marks omitted). We review the BIA's denial of humanitarian asylum for an abuse of discretion. *Karomi v. Gonzales*, 168 F. App'x 719, 723 (6th Cir. 2006); *Hadad v. Ashcroft*, 127 F. App'x 800, 802 (6th Cir. 2005).

Given the high bar that must be met to warrant a grant of humanitarian asylum, we find that the BIA did not abuse its discretion in denying Mbodj this relief. The IJ's rationale for denying humanitarian asylum—because Mbodj had been able to work, marry, and have children in Senegal, and could have applied for asylum there—was not on point, but the BIA did not adopt this rationale. Instead, the BIA relied on two previous decisions, *In re A-T-*, 24 I. & N. Dec. 296 (BIA 2007), and *In re N-M-A-*, 22 I. & N. Dec. 312 (BIA 1998), that involve persecution the BIA deemed insufficiently severe to merit humanitarian relief. As these cases suggest, the persecution Mbodj

suffered simply is not in the same realm as that which warrants humanitarian asylum. *Cf. Cutaj*, 206

F. App'x at 492 (noting that "the concept of humanitarian asylum was designed for the case of the

German Jews, the victims of the Chinese Cultural Revolution, survivors of the Cambodian genocide,

and a few other such extreme cases") (internal quotation marks omitted)); *Karomi*, 168 F. App'x at

726-27 (collecting cases). None of the cases on which Mbodj relies is to the contrary. *See In re H-*,

21 I. & N. Dec. 337, 348 (BIA 1996) (finding that applicant had demonstrated past persecution but

not reaching question of whether humanitarian asylum was warranted); *In re B-*, 21 I. & N. Dec. 66,

67, 72 (BIA 1995) (granting humanitarian asylum to petitioner who was imprisoned in Afghanistan

for thirteen months, including three months during which he was subjected to sleep deprivation,

beatings, and electric shocks applied to his fingers); *In re Chen*, 20 I. & N. Dec. 16, 19-21 (BIA

1989) (granting humanitarian asylum to survivor of Chinese Cultural Revolution who had been

subjected to continuing interrogation, beatings, and periodic imprisonment over the course of more

than nine years, leaving him physically debilitated and emotionally traumatized).

Admittedly, the BIA's consideration of this issue is extremely brief, consisting of only the

conclusory statement that humanitarian asylum was not merited and the citation to the two cases in

support. But given that the BIA was addressing an issue that Mbodj had not raised, and given that

the cases the BIA cited point to the significant gap between the persecution that Mbodj suffered and

that which might merit humanitarian asylum, the BIA's summary dismissal was not an abuse of

discretion. *Cf. Pepaj v. Mukasey*, 307 F. App'x 891, 898 (6th Cir. 2009) ("'[T]he Board has no duty

to write an exegesis on every contention. What is required is merely that it consider the issues raised,

and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard

and thought and not merely reacted.'") (quoting *Scorteanu v. INS*, 339 F.3d 407, 412 (6th Cir. 2003))).

## III. CONCLUSION

For all the reasons above, we **AFFIRM** the decision of the Board of Immigration Appeals and **DENY** Mbodj's petition.