RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0267p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ANA SANCHEZ SEBASTIAN-SEBASTIAN; MAGDALENA
SEBASTIAN-SEBASTIAN,

                *Petitioners*,

    *v.*

MERRICK B. GARLAND, Attorney General,

                *Respondent*.

No. 23-3059

─────────────────

On Petition for Review of an Order of the Board of Immigration Appeals.
Nos. A 209 004 119; A 209 004 121.

Decided and Filed: December 8, 2023

Before: MOORE, McKEAGUE, and KETHLEDGE, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:** Ashley Robinson, THE LAW OFFICES OF JAMIE B. NAINI, Memphis, Tennessee, for Petitioners. Christin M. Whitacre, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

─────────────────

**OPINION**

─────────────────

KAREN NELSON MOORE, Circuit Judge. Petitioner Ana Sanchez Sebastian-Sebastian petitions for review of the Board of Immigration Appeals' denial of her application for asylum and withholding of removal under the Immigration and Nationality Act as well as protection under the Convention Against Torture. She also challenges the Board's decision under the Due Process Clause of the Fifth Amendment. In its denial of asylum and withholding of removal

under the INA, the Board found that Sebastian-Sebastian failed to demonstrate a nexus between her particular social groups and the harm she faced. In its denial of CAT protection, the Board found that Sebastian-Sebastian failed to demonstrate that she is more likely than not to be tortured if removed to Guatemala. On appeal, Sebastian-Sebastian argues that the Board's conclusions were not supported by substantial evidence on the record as a whole. Because the Board's failure to make necessary findings as to the asylum and withholding of removal claims is erroneous, but its conclusion as to Sebastian-Sebastian's CAT claim is supported by substantial evidence, we **GRANT** Sebastian-Sebastian's petition for review in part, **DENY** in part, **VACATE** the Board's denial of her application for asylum and withholding of removal, and **REMAND** to the Board for reconsideration consistent with our opinion.

## I. BACKGROUND

### A. Procedural History

Petitioner Ana Sanchez Sebastian-Sebastian is a native and citizen of Guatemala. A.R. at 346 (Sebastian-Sebastian Asylum App. at 1). Rider Petitioner Magdalena Sebastian-Sebastian, Ana Sanchez Sebastian-Sebastian's daughter, is also a native and citizen of Guatemala. A.R. at 347 (Sebastian-Sebastian Asylum App. at 2). Petitioners entered the United States on or about April 20, 2016, and were not admitted or paroled by an immigration officer. *Id.* On April 13, 2017, Sebastian-Sebastian[1] filed an application for asylum and withholding of removal under the INA as well as protection under the Convention Against Torture and included Magdalena on her application for relief as the unmarried child of an asylum applicant. A.R. at 347, 354 (Sebastian-Sebastian Asylum App. at 2, 9). Magdalena has not filed her own application for relief and seeks derivative asylum only. A.R. at 230–31 (Hr'g Tr. at 51–52).

The Department of Homeland Security initiated removal proceedings against Sebastian-Sebastian and Magdalena Sebastian-Sebastian by serving them both with Notices to Appear. A.R. at 508 (Sebastian-Sebastian Not. to Appear); A.R. at 533 (Magdalena Sebastian-Sebastian Not. to Appear). On February 16, 2018, Sebastian-Sebastian's hearing commenced. A.R. at 229

---

[1]Sebastian-Sebastian refers to Ana Sanchez Sebastian-Sebastian. Any discussion of her daughter, Rider Petitioner Magdalena Sebastian-Sebastian, will refer to her as Magdalena Sebastian-Sebastian or Magdalena.

(Hr'g Tr.). At the hearing, Immigration Judge Rebecca L. Holt heard testimony from Sebastian-Sebastian, Magdalena, and Sebastian-Sebastian's cousin, Elizabeth. *Id.* In front of Immigration Judge Holt, Sebastian-Sebastian claimed eligibility for asylum and withholding of removal based on her membership in four particular social groups: (1) "Guatemalan Chuj Women in domestic relationships who are unable to leave," (2) "Guatemalan Chuj Women who are viewed as property by virtue of their positions within a domestic relationship," (3) "nuclear family of [Sebastian-Sebastian's late husband]," and (4) "Guatemalan Women perceived as . . . witches." A.R. at 298–99 (Hr'g Tr. at 119–20).

On February 21, 2018, Immigration Judge Holt denied Sebastian-Sebastian's application for asylum, withholding of removal, and CAT protection. A.R. at 149–74 (IJ Dec.). Sebastian-Sebastian appealed. A.R. at 134 (Not. of Appeal). On January 6, 2023, the Board of Immigration Appeals ("Board" or "BIA") dismissed her appeal. A.R. at 3 (BIA Dec. at 1). Sebastian-Sebastian now appeals the Board's dismissal of her application for asylum, withholding of removal, and CAT protection. Pet'r Br. at 2. She also challenges the Board's decision under the Due Process Clause of the Fifth Amendment. *Id.* at 56.

On April 19, 2023, Sebastian-Sebastian filed an Emergency Motion for Stay of Removal Pending Decision on Appeal in this court. (Pet'r Emergency Mot.). The motion indicated that Sebastian-Sebastian had been detained by the United States Immigration and Customs Enforcement and was facing removal. *Id.* at 2. The United States Attorney General opposed the stay of removal. (Resp. Opp. to Pet'r Emergency Mot.). On April 28, 2023, a panel of this court denied Sebastian-Sebastian's motion to stay removal. *Sebastian-Sebastian v. Garland*, No. 23-3059 (6th Cir. Apr. 28, 2023) (order).

**B. Factual Background**

Ana Sebastian-Sebastian was born on March 25, 1981 in San Sebastian Coatan, Guatemala. A.R. at 346 (Sebastian-Sebastian Asylum App. at 1). In 1998, at seventeen years old, Sebastian-Sebastian married Mateo Sebastian Martin and moved into his parents' house in San Jose, Guatemala. A.R. at 240–41 (Hr'g Tr. at 61–62). Approximately one year later, in

1999, their daughter Magdalena Sebastian-Sebastian was born.  A.R. at 239, 242 (Hr'g Tr. at 60, 63).

Following their marriage, Sebastian-Sebastian and her husband lived with her husband's parents due to cultural customs.  The couple was "not to decide where [they were] to go to live," but instead "had to go and live with his parents," because "[t]hat's the way it is."  A.R. at 241 (Hr'g Tr. at 62).

Shortly into their marriage, Sebastian-Sebastian's husband began abusing her.  He would hit her "every week, once a week."  A.R. at 243 (Hr'g Tr. at 64).  Sebastian-Sebastian's husband hit her with his belt or a stick and would sometimes whip her while she was naked.  A.R. at 244–45 (Hr'g Tr. at 65–66).  He continued to beat her while she was pregnant with their daughter.  *Id.* Sebastian-Sebastian would sometimes have cuts or bruises from his beatings.  *Id.*  Though she may have required medical care from the beatings, her husband "didn't care," and would tell her that "if you die, you die, I don't care."  A.R. at 275 (Hr'g Tr. at 96).  Sebastian-Sebastian's husband also regularly called her an animal and compared her to a horse.  A.R. at 243 (Hr'g Tr. at 64).

In addition to physically and psychologically abusing her, Sebastian-Sebastian's husband also sexually abused her.  A.R. at 246–47 (Hr'g Tr. at 67–68).  Beginning in 2007, Sebastian-Sebastian's husband raped her approximately five times.  *Id.*  Though Sebastian-Sebastian never contracted any diseases as a result of these rapes, she greatly feared "what type of illness [she] could get from him," because "when he goes out in the street and he will find any woman and be with any woman."  A.R. at 247 (Hr'g Tr. at 68).

Sebastian-Sebastian's husband also abused their daughter.  Starting when Magdelana was six years old, "he would take out his belt and he would start to hit her with the belt."  A.R. at 248–49 (Hr'g Tr. at 69–70).  On several occasions, Magdalena's nose would bleed after he hit her in the face with his belt.  *Id.*  He would also "call her names" and tell Magdalena that she was "not worth anything" and she was "the same as [her] mother . . . like an animal."  A.R. at 248 (Hr'g Tr. at 69).

Sebastian-Sebastian's in-laws were present and took part in both her and her daughter's abuse. A.R. at 249 (Hr'g Tr. at 70). Sebastian-Sebastian's husband "usually" hit her because "his mother . . . would tell him [to]." A.R. at 245–46 (Hr'g Tr. at 66–67). Though he "sometimes" hit her because he wanted to, it was most often at his mother's urging. *Id.* In urging him to hit her, Sebastian-Sebastian's mother-in-law would say that Sebastian-Sebastian should leave and "go back" to her own village. A.R. at 246 (Hr'g Tr. at 67).

Despite this abuse, cultural expectations meant that Sebastian-Sebastian could not leave her domestic relationship; she "had to stay there and just . . . keep . . . taking the beatings." *Id.* This was typical in Sebastian-Sebastian's culture; she explained that many women are "treated that way" but nonetheless remain with their husband's families. A.R. at 262 (Hr'g Tr. at 83). In 2007, the same year that Sebastian-Sebastian's husband began raping her, Sebastian-Sebastian's in-laws began accusing her of being a witch. A.R. at 273–74 (Hr'g Tr. at 94–95).

On December 12, 2010, Sebastian-Sebastian's husband died. A.R. at 357 (Sebastian-Sebastian Asylum App. at 11). Following his death, because cultural customs allegedly required it, Sebastian-Sebastian and her daughter continued living with her in-laws.**2** *Id.*; *see also* A.R. at 303 (Hr'g Tr. at 124) (Test. of Elizabeth Sebastian-Sebastian) ("[O]ur culture is that if your husband dies that you have to stay and live there."). Her in-laws threatened to hit her and limited her access to drinking water. A.R. at 252 (Hr'g Tr. at 73); *see also* A.R. at 287 (Hr'g Tr. at 108) (Test. of Magdalena) ("[T]here's running water nearby where we get water but the rest of the people would get mad that we go get water there because they said that we didn't belong there and that we didn't have the right to . . . get water from there."); A.R. at 357 (Sebastian-Sebastian Asylum App. at 11) ("[My mother-in-law] told me that Magdalena and I could no longer use the purified water pump, because it was her and her sons' water."). Sebastian-Sebastian's in-laws did not physically beat her following her husband's death, but "sometimes they wanted to," and Sebastian-Sebastian would have to "hide from them." A.R. at 273 (Hr'g Tr. at 94).

At one point, Sebastian-Sebastian's mother-in-law took Magdalena and "threw [Sebastian-Sebastian] outside of her house." A.R. at 254–55 (Hr'g Tr. at 75–76). Sebastian-

---

**2**Sebastian-Sebastian's father-in-law died in 2013. A.R. at 241 (Hr'g Tr. at 62). Following his death, they continued living with Sebastian-Sebastian's mother-in-law.

Sebastian lived on the street for one week without access to her daughter.  *Id.*  After the week, Sebastian-Sebastian returned to her mother-in-law's home and begged her to let her come home.  *Id.*

In approximately 2015, when Magdalena was fifteen or sixteen years old, Jaime, Sebastian-Sebastian's brother-in-law, publicly accused Sebastian-Sebastian, as well as Magdalena, of being a witch.  A.R. at 257, 260 (Hr'g Tr. at 78, 81).  Jaime and Sebastian-Sebastian's mother-in-law informed the town "authorities" of Sebastian-Sebastian's "witchcraft," and the town authorities held a meeting to deal with the accusations.  A.R. at 257–60 (Hr'g Tr. at 78–81).  At the town meeting, townspeople gathered with "rocks or sticks."  A.R. at 259 (Hr'g Tr. at 80).  The townspeople "put [Sebastian-Sebastian] . . . on top of a table so that all people would look at [her], would see [her]," and could determine if she was, in fact, a witch.  *Id.*  If it were determined that Sebastian-Sebastian and Magdalena were witches, the townspeople "would have killed [Sebastian-Sebastian]," and killed Magdalena with her.  A.R. at 260 (Hr'g Tr. at 81).  Just three years prior, Sebastian-Sebastian had witnessed a similar witch-trial in which the townspeople found that "a woman that lived nearby" was a witch, and "they burned her."  A.R. at 260–61 (Hr'g Tr. at 81–82).

At the town meeting, the townspeople determined that Sebastian-Sebastian was not a witch and let both her and Magdalena go.  A.R. at 259 (Hr'g Tr. at 80).  Sebastian-Sebastian then tried to return to her mother-in-law's house, but her mother-in-law prohibited her from entering, told her to leave, and told her that "she would kill [her] if [she] returned there."  A.R. at 261 (Hr'g Tr. at 82).  Because they did not "have anywhere to go," Sebastian-Sebastian and Magdalena "were left out in the street."  A.R. at 262 (Hr'g Tr. at 83).  They lived on the streets for approximately two weeks before Sebastian-Sebastian called her cousin, Elizabeth, who lived in the United States, for help.  A.R. at 264 (Hr'g Tr. at 85).  Sebastian-Sebastian has family in Guatemala:  her mother and brothers live in her hometown of Tzununcab.  A.R. at 270–71 (Hr'g Tr. at 91–92).  She could not return to them because her brothers are "drunks," and "don't really have a good life," and her mother was "living with an uncle" and does not have her own home.  A.R. at 238, 264 (Hr'g Tr. at 59, 85).  Moreover, Sebastian-Sebastian explained that cultural customs dictate that she was required to live with her in-laws even after her husband died; "when

[she] got married it's that [she] got married forever and . . . [she has] to stay there." A.R. at 276 (Hr'g Tr. at 97). On April 13, 2016, Sebastian-Sebastian left Guatemala for the United States. A.R. at 346 (Sebastian-Sebastian Asylum App. at 1).

While living with her in-laws, Sebastian-Sebastian never reported abuse—either at the hand of her husband or her in-laws—to the police. A.R. at 251 (Hr'g Tr. at 72). She testified that "there's no law that will help," and, furthermore, either her husband or her in-laws told her that they were "the law here and [she's] not going to go anywhere." *Id.* Jaime, Sebastian-Sebastian's brother-in-law, "works in the municipality there," and her in-laws have said that if she goes to the police, "they have money [and] they will bribe the police" not to help her. A.R. at 268 (Hr'g Tr. at 89).

Sebastian-Sebastian's mother-in-law found her United States phone number and has called her once since she arrived in the United States. A.R. at 265 (Hr'g Tr. at 86). On that call, her mother-in-law told Sebastian-Sebastian that "if [she] ever go[es] back there that she would kill [her]." *Id.* A pastor's wife from her mother-in-law's town also told Sebastian-Sebastian that her mother-in-law has been saying that if Sebastian-Sebastian ever returns, she will kill her. A.R. at 266 (Hr'g Tr. at 87).

## II. ANALYSIS

### A. Jurisdiction and Standard of Review

We have jurisdiction under 8 U.S.C. § 1252 to review the Board of Immigration Appeals' final determination ordering removal. *Umaña-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013). When the Board "reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). We review the immigration judge's decision only "[t]o the extent the BIA adopted the immigration judge's reasoning." *Id.* We review factual findings under the substantial-evidence standard and review questions of law de novo. *Umaña-Ramos*, 724 F.3d at 670. Under the substantial-evidence standard, "we will not reverse a factual determination . . . unless we find 'that the evidence not only supports a contrary conclusion, but *compels* it.'" *Ceraj v. Mukasey*, 511 F.3d

583, 588 (6th Cir. 2007) (quoting *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004)); 8 U.S.C. § 1252(b)(4)(B).  A nexus determination is a finding of fact and is thus reviewed under the substantial-evidence standard.  *Turcios-Flores v. Garland*, 67 F.4th 347, 357 (6th Cir. 2023). We uphold the Board's determination if "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).  Because the IJ found the parties credible, "we accept their factual statements as true." *Mandebvu v. Holder*, 755 F.3d 417, 424 (6th Cir. 2014).  Claims of due-process violations in removal proceedings are reviewed de novo.  *Bi Qing Zheng v. Lynch*, 819 F.3d 287, 296 (6th Cir. 2016).

**B. Asylum**

The Immigration and Nationality Act authorizes the Attorney General, in his discretion, "to grant asylum to applicants who meet the definition of a 'refugee.'"  *Umaña-Ramos*, 724 F.3d at 670 (citing 8 U.S.C. § 1158(b)).  A "refugee" is "a person who is unable or unwilling to return to her home country because of past persecution or a 'well-founded fear' of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'"  *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136 (6th Cir. 2010) (quoting 8 U.S.C. § 1101(a)(42)).

Persecution is "the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim."  *Al-Ghorbani v. Holder*, 585 F.3d 980, 997 (6th Cir. 2009) (quoting *Khalili*, 557 F.3d at 436)). Motive is a critical element of persecution.  *Id.*  Accordingly, petitioners "must provide *some* evidence of [motive], direct or circumstantial."  *Elias-Zacarias*, 502 U.S. at 483.

To establish persecution under the statute, an asylum applicant must demonstrate that a statutorily protected ground is "at least one central reason" for their persecution.  8 U.S.C. § 1158(b)(1)(B)(i).  One statutorily protected ground is membership in a particular social group. We have defined a "particular social group" as "a group of individuals who share a common, immutable characteristic that is one that members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences."

*Marikasi v. Lynch*, 840 F.3d 281, 290 (6th Cir. 2016). A particular social group is "both particular and socially visible." *Bonilla-Morales*, 607 F.3d at 1137. We "may not presume that persecution is on account of one of the statutory grounds," such as membership in a particular social group. *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008). Instead, to determine if a central reason for the applicant's persecution is a protected ground, we "examin[e] the nature of the conduct on which an application for asylum is based, [and] we . . . look[] to the overall context of the applicant's situation." *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005) (per curiam).

Asylum is not available if the applicant "fears retribution solely over personal matters." *Zoarab*, 524 F.3d at 781. If there is a nexus between persecution and membership in a particular social group, however, "the simultaneous existence of a personal dispute does not eliminate that nexus." *Bi Xia Qu v. Holder*, 618 F.3d 602, 608 (6th Cir. 2010); *see also Al-Ghorbani*, 585 F.3d at 997 ("[T]he conclusion that a cause of persecution is economic does not necessarily imply that there cannot exist other causes of the persecution." (quoting *Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir. 1994))). If "an asylum applicant demonstrates that she was persecuted on the basis of more than one factor, she is eligible for asylum so long as" a statutorily protected ground is "at least one central reason" for the persecution. *Marku*, 380 F.3d at 988 n.10; 8 U.S.C. § 1158(b)(1)(B)(i). Stated succinctly, an asylum applicant who was persecuted based on mixed motives may be eligible for asylum. If "at least one central reason" for her persecution is a statutorily protected ground, additional motives do not undermine her claim. 8 U.S.C. § 1158(b)(1)(B)(i).

Sebastian-Sebastian asserts that her past persecution and feared future persecution are on account of her membership in four proposed particular social groups: (1) "Guatemalan Chuj [w]omen in domestic relationships who are unable to leave," (2) "Guatemalan Chuj [w]omen who are viewed as property by virtue of their positions within a domestic relationship," (3) the "nuclear family of [Sebastian-Sebastian's late husband]," and (4) "Guatemalan [w]omen perceived as . . . witches." A.R. at 298–99 (Hr'g Tr. at 119–20).

The BIA, "[w]ithout reaching whether [Sebastian-Sebastian's] proposed particular social groups are cognizable under the INA," held that she did "not demonstrate[ that] the harm she

suffered at the hands of her husband or her in-laws was on account of her membership in the proposed social groups." A.R. at 4 (BIA Dec. at 2). Instead, the BIA, affirming the IJ's decision, held that Sebastian-Sebastian "was harmed by her husband and in-laws because of a personal vendetta against [Sebastian-Sebastian] by her mother-in-law[,] rather than a protected ground." A.R. at 5 (BIA Dec. at 3).

The BIA addressed Sebastian-Sebastian's first two proposed particular social groups together. The BIA acknowledged Sebastian-Sebastian's "testimony that her husband stated he 'could do anything he wanted to her' and compared her to an animal, as well as generally high levels of violence in Guatemala against indigenous women." A.R. at 5 (BIA Dec. at 3). But the Board held that any evidence of prejudice was "unpersuasive" given Sebastian-Sebastian's "repeated testimony that her husband harmed her because of his mother's personal animosity." *Id.* The Board similarly credited Sebastian-Sebastian's cousin Elizabeth's testimony that Sebastian-Sebastian's mother-in-law "held a personal grudge" against her. A.R. at 5 (BIA Dec. at 3). Given this testimony, the Board held that the immigration judge did not clearly err when it found that Sebastian was harmed based on personal animus and did "not establish[] the requisite nexus between her harm and a protected ground." *Id.*

The BIA thus concluded that Sebastian-Sebastian was ineligible for asylum. If, however, "at least one central reason" for Sebastian-Sebastian's persecution is a statutorily protected ground, additional motives do not undermine her claim. 8 U.S.C. § 1158(b)(1)(B)(i); *Marku*, 380 F.3d at 988 n.10. The BIA rejected Sebastian-Sebastian's claim without considering that her persecutors may have had mixed motives for their persecution. The BIA erroneously stopped short: It found one motive and prematurely ended its analysis there, ignoring the fact that a "conclusion that a cause of persecution is [personal] does not necessarily imply that there cannot exist other causes of persecution." *Osorio*, 18 F.3d at 1028; *see also Bi Xia Qu*, 618 F.3d at 608; *Al-Ghorbani*, 585 F.3d at 997.

In *Al-Ghorbani v. Holder*, Al-Ghorbani, a member of "the lowest class in Yemen," fell in love with Najla, a member of "the highest kind of families in Yemen." *Al-Ghorbani*, 585 F.3d at 984. After Al-Ghorbani and Najla married without her father's permission, her father came after Al-Ghorbani and his family and physically attacked, imprisoned, and tortured members of his

family.  *Id.* at 985–87.  The BIA held that Al-Ghorbani had not demonstrated a nexus between his claimed persecution and a protected statutory ground—namely his social class and his "opposition to Yemeni paternalistic rights," *id.* at 997–98—because there was "no indication that this is anything other than a personal vendetta that [Najla's father] has against his son-in-law for marrying his daughter without his permission," and denied asylum and withholding of removal,[3] *id.* at 990–91.

This court, in *Al-Ghorbani*, granted review of the BIA's decision and held that "the record compels a finding that [Al-Ghorbani has] proven the required nexus between [the harm] and [his] membership in a particular social group."  *Id.* at 998.  We explained that, though Al-Ghorbani's persecution may have been partially motivated by a personal vendetta, that was not the "sole motivation," and Najla's father's "personal motives cannot be unraveled from his motives based on [Al-Ghorbani's] social class and . . . opposition to Yemeni paternalistic rights." *Id.* at 997–98.  Because the persecutor's "prejudice and traditional views underlay all of his actions," we held that "[o]ne cannot fairly distinguish [his] personal vendetta from his prejudice and traditional views.  The motivations are inextricably intertwined." *Id.* at 998.

Despite this precedent, the Board here failed to consider that the mother-in-law's personal vendetta and her prejudice were similarly intertwined.  This was an error.  There is little evidence in the record indicating that the mother-in-law disliked Sebastian-Sebastian based on her personality, her qualities as an individual, or any other personal reason.  Instead, the parties provided ample evidence for the Board to conclude that Sebastian-Sebastian's mother-in-law harmed her, at least in central part, *because* Sebastian-Sebastian could not leave, a characteristic that is a core aspect of two of her proposed social groups—Guatemalan Chuj women in domestic relationships who are unable to leave and who are viewed as property by virtue of their relationship.  The mother-in-law repeatedly kicked Sebastian-Sebastian out, A.R. at 254–55 (Hr'g Tr. at 75–76); A.R. at 261 (Hr'g Tr. at 82), and told Sebastian-Sebastian to leave and "go

---

[3]In *Al-Ghorbani*, the Board denied asylum on timeliness grounds and denied withholding of removal based on this nexus determination.  The standard for a nexus determination differs for withholding of removal and asylum. *Guzman-Vazquez v. Barr*, 959 F.3d 253, 271–74 (6th Cir. 2020) (explaining that a protected ground must be "one central reason" for persecution to warrant asylum, whereas a protected ground need be only "a reason" for persecution to warrant withholding of removal).  That said, the *Al-Ghorbani* court's nexus discussion touches both asylum and withholding of removal and thus remains informative for this asylum claim.

back" to her own village as she encouraged Sebastian-Sebastian's husband to beat her, A.R. at 246 (Hr'g Tr. at 67). Because cultural expectations dictated that a Guatemalan Chuj woman in her position—both viewed as property and unable to leave by virtue of her domestic relationship—must stay with her in-laws and have nowhere else to go, Sebastian-Sebastian refused to leave her mother-in-law's home. *Id.*; A.R. at 262 (Hr'g Tr. at 83); A.R. at 303 (Hr'g Tr. at 124). This is sufficient evidence for the BIA to conclude that Sebastian-Sebastian's membership in these groups "underlay[s] all of [her persecutors'] actions." *Al-Ghorbani*, 585 F.3d at 998.

Despite this evidence, the Board apparently never considered whether Sebastian-Sebastian's mother-in-law had a personal motivation and a particular-social-group-related motivation that "[were] inextricably intertwined." *Al-Ghorbani*, 585 F.3d at 998. The Board similarly never considered whether Sebastian-Sebastian's husband's motives were "inextricably intertwined" with her particular social groups, because it attributed her husband's persecution to her mother-in-law's personal animosity towards her. The Board's failure to consider this possibility was in error.

The Board also held that Sebastian-Sebastian failed to demonstrate a nexus between her membership in a proposed social group of Guatemalan women perceived as witches and the harm she faced. A.R. at 5 (BIA Dec. at 3). Unlike the first two proposed social groups, there is no record evidence indicating that Sebastian-Sebastian faced persecution on account of her status as a perceived witch, even as a mixed motive. Sebastian-Sebastian did not present any evidence of potential mixed motives connected to this proposed social group, and so the Board did not err in concluding that Sebastian-Sebastian failed to prove a nexus here.

As to Sebastian-Sebastian's particular social group of family members of her late husband, the Board held that she did not demonstrate a nexus to harm because she relied "on the existence of the familial relationship" and nothing else. A.R. at 5 (BIA Dec. at 3). Sebastian-Sebastian argues that "[t]he record clearly demonstrates that the motivations of [her husband] and his family in harming Petitioner were driven by her kinship ties to [her husband]." Pet'r Br. at 44. Sebastian-Sebastian, however, fails to point to any specific evidence in the record or otherwise demonstrate that her membership in the social group of family members of her

husband was a central reason, or even *a* reason, for the persecution she faced. Because the evidence does not compel a finding that Sebastian-Sebastian's persecution was on account of her membership in her family group, we will not disturb the Board's determination on this question.

The BIA, failing to consider possible mixed motives relating to the first two proposed social groups, thus failed to fully consider whether Sebastian-Sebastian could prove that her persecution had a nexus to a protected ground. The BIA also declined to address the other factors necessary for Sebastian-Sebastian to meet her burden of proof for asylum or withholding of removal. A.R. at 5 (BIA Dec. at 3) ("As nexus to a protected ground is dispositive to the respondent's application for asylum and withholding of removal[,] . . . we need not reach her remaining arguments pertaining to those applications."). "When the BIA does not fully consider an issue, as in the instant case, the Supreme Court has instructed that a reviewing court 'is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed.'" *Bi Xia Qu*, 618 F.3d at 609 (quoting *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006)). Instead, the "proper course, except in rare circumstances, is to remand to the [BIA] for additional investigation or explanation." *Id.* (quoting *Thomas*, 547 U.S. at 186) (alteration in original). We, accordingly, remand to the BIA to address whether Sebastian-Sebastian was persecuted based on her membership in her first two proposed particular social groups and the remaining asylum considerations.

## C. Withholding of Removal

The Board analyzed Sebastian-Sebastian's application for asylum and application for withholding of removal under the INA in concert. *See* A.R. at 4–5 (BIA Dec. at 2–3). In doing so, the Board stated that it was "unpersuaded [that] the Immigration Judge clearly erred in finding [that Sebastian-Sebastian] had not established [that] membership in her proposed social groups was 'one central reason' or 'a reason' for her past and feared future harm." A.R. at 5 (BIA Dec. at 3). We have explained that the nexus showing required for withholding of removal differs from the nexus showing required for asylum. *Guzman-Vazquez*, 959 F.3d at 272–74. Whereas an asylum claim requires that a statutorily protected ground be "at least one central reason" for alleged persecution, *id.* at 270 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)), a withholding

of removal claim requires only that a statutorily protected ground be "a reason" for alleged persecution, *id.* at 271 (quoting 8 U.S.C. § 1231(b)(3)(C)).

"[W]ithholding of removal is mandatory if the applicant can establish a clear probability of future persecution." *Mapouya v. Gonzales*, 487 F.3d 396, 413–14 (6th Cir. 2007). "A 'clear probability' has been defined as more than a 50 percent likelihood of persecution." *Id.* at 414. When the BIA analyzes asylum and withholding of removal in concert and "does not 'examine the evidence and make specific findings regarding the probability' of persecution with respect to the withholding of removal claim, this court does not have sufficient grounds to review the decision under the substantial evidence standard." *Juan Antonio v. Barr*, 959 F.3d 778, 797 (6th Cir. 2020) (quoting *Gilaj*, 408 F.3d at 289). Instead, when we "remand[] to the agency to reconsider the asylum claim, the Board 'should consider on remand whether petitioners are entitled to withholding of removal based on all of the evidence [in the] record.'" *Id.* at 797–98 (quoting *Gilaj*, 408 F.3d at 289). Accordingly, on remand, the Board should consider Sebastian-Sebastian's withholding of removal claim.

**D. Humanitarian Asylum**

Humanitarian asylum may be granted if the applicant demonstrates (1) "'compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution,' or (2) . . . a reasonable possibility [that] an applicant . . . 'may suffer other serious harm upon removal to that country,' even in the absence of a well-founded fear of future persecution." *K.H. v. Barr*, 920 F.3d 470, 478–79 (6th Cir. 2019) (quoting *Mbodj v. Holder*, 394 F. App'x 239, 244 (6th Cir. 2010)). "Humanitarian asylum is a form of 'extraordinary relief' that is appropriate only 'in rare instances' where the applicant has 'suffered under atrocious forms of persecution.'" *Id.* at 479 (quoting *Mbodj*, 394 F. App'x at 244–45).

Humanitarian asylum "is 'not a separate form of relief created by the Immigration and Nationality Act,' but rather 'is a discretionary form of relief that may be granted to certain asylum seekers.'" *Juan Antonio*, 959 F.3d at 798 (quoting *Ordonez-Quino v. Holder*, 760 F.3d 80, 95 (1st Cir. 2014)). Because "humanitarian asylum is one avenue to achieve asylum under

the broader statutory scheme, rather than a distinct form of relief," on remand, the Board should consider Sebastian-Sebastian's humanitarian asylum claim. *Id.*

## E.  Convention Against Torture

Sebastian-Sebastian also petitions for review of the denial of her claim for relief under CAT.  To succeed on a claim for CAT relief, "an applicant must 'establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.  The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.'"  *Namo v. Gonzales*, 401 F.3d 453, 457 (6th Cir. 2005) (quoting 8 C.F.R. § 208.16(c)(2)).

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

To assess the risk of torture, the adjudicator must consider:  "(i) evidence of past torture inflicted on the applicant; (ii) evidence that the applicant could relocate to a part of the country where he is likely not to be tortured; (iii) evidence of gross, flagrant or mass violations of human rights within the country to which the applicant will be removed; and, (iv) other relevant information about the country to which the applicant will be removed."  *Namo*, 401 F.3d at 457; *see also* 8 C.F.R. § 208.16(c)(3) (stating that these factors "shall be considered").  A CAT claim poses a "separate question of the threat of torture" that is considered "without regard to the enumerated ground for asylum." *Mapouya*, 487 F.3d at 414 (quoting *Karomi v. Gonzales*, 168 F. App'x 719, 729 (6th Cir. 2006)).  An applicant can therefore succeed on a CAT claim even if they fail on their asylum or withholding of removal claims under the INA. *Id.*

The Board, affirming the IJ's finding, held that Sebastian-Sebastian "did not establish that it is more likely than not [that] she will be tortured by or with the acquiescence (including

the concept of willful blindness) of a public official on removal to Guatemala." A.R. at 6 (BIA Dec. at 4). To make that holding, the Board relied on record evidence indicating that Sebastian-Sebastian's "husband and father-in-law are now deceased[,] . . . she has only received one threat from her mother-in-law since she left the family home, and there is no indication [that] her mother-in-law has searched for her since she left." *Id.* The Board also acknowledged Sebastian-Sebastian's "arguments that country condition evidence show[ed] a continued high level of violence against women," but held that such evidence did not persuade it that she was "more likely than not to be tortured upon return to Guatemala." *Id.*

On appeal, Sebastian-Sebastian argues that the IJ failed to consider "the ineffective role of law enforcement in Guatemala, . . . [and] the fact that [Sebastian-Sebastian's] brother-in-law that had her put on trial for being a witch, works for the government." Pet'r Br. at 52. Sebastian-Sebastian also states that, because she "would likely be tortured if she returns to Guatemala, and the government acquiesces to the kind of torture she suffered, she is eligible for relief under CAT." *Id.* at 53.

Contrary to Sebastian-Sebastian's argument before this court, which focuses entirely on the IJ, the BIA did address country conditions, including the role of law enforcement, when it stated that the "country condition evidence showing a continued high level of violence against women" does not establish that it "is more likely than not [that Sebastian-Sebastian will be] tortured upon return to Guatemala." A.R. at 6 (BIA Dec. at 4). As to her brother-in-law's role in the government, Sebastian-Sebastian failed to make this argument on appeal to the BIA. *See* A.R. 75–78 (Pet'r BIA Br. at 58–61). When an applicant fails to raise an issue before the BIA, we will not review the issue on appeal. *Gilaj*, 408 F.3d at 289; *Bi Xia Qu*, 618 F.3d at 609.

Finally, we are not compelled to conclude that the BIA erred in holding that Sebastian-Sebastian "did not establish that it is more likely than not [that] she will be tortured" if removed to Guatemala. A.R. at 6 (BIA Dec. at 4). To be eligible for CAT relief, "an applicant must 'establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Namo*, 401 F.3d at 457 (quoting 8 C.F.R. § 208.16(c)(2)). Despite her conclusory statements that "she would likely be tortured if she returns to Guatemala," Sebastian-Sebastian presents no evidence whatsoever that she is more likely than

not to be tortured if removed.  Pet'r Br. at 53.  On this record, there is substantial evidence to support the Board's findings on Sebastian-Sebastian's CAT claim.

**F.  Due-Process Claim**

Sebastian-Sebastian contends that the BIA violated her right to due process when it "fail[ed] to address several issue[s] that were raised on appeal," and when the BIA and the IJ "failed to consider all factors present."  Pet'r Br. at 57–58.  "Due process requires that an [immigrant] be afforded a full and fair hearing." *Mapouya*, 487 F.3d at 415–16.  "To prevail on a due process claim, a petitioner must demonstrate actual prejudice, and that the alleged prejudice materially affected the outcome" of their case. *Id.*

Sebastian-Sebastian argues that, given the evidence, "it is apparent that [her] life, safety, and freedom would be in danger, and she would be subjected to torture if she is removed to Guatemala."  Pet'r Br. at 58.  Sebastian-Sebastian continues that, "[a]s such, it is clear that a defect in the removal proceedings existed due to the failure of the IJ to consider the effect of Petitioner's removal and the BIA's failure to address all issues raised on appeal." *Id.*  The IJ and the Board's disagreement with her view of the evidence, however, is not a violation of due process. *See Gil-Cerqueda v. Rosen*, 841 F. App'x 815, 822 (6th Cir. 2021).  Sebastian-Sebastian's "failure to identify the factors allegedly not taken into account" further means that she "cannot show that [s]he was prejudiced by the purported defect." *Id.*  The Board and the IJ did not violate Sebastian-Sebastian's right to due process.

## III.  CONCLUSION

For the foregoing reasons, we **GRANT** Sebastian-Sebastian's petition for review in part, **DENY** in part, **VACATE** the Board's denial of her application for asylum and withholding of removal, and **REMAND** to the Board for reconsideration consistent with our opinion.